IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES MARITIME ADMINISTRATION, PETE BUTTIGIEG, in his official capacity, and LUCINDA LESSLEY, in her official capacity,<br><br>Defendants. | Civil Action No.: <u>4:21-cv-132</u><br><br>**Complaint for Declaratory and Injunctive Relief** |

## INTRODUCTION

1.      This case involves the United States Maritime Administration's (MARAD) America's Marine Highway Program, which is designed to expand the use of America's navigable waterways for commercial transportation. MARAD violated the Endangered Species Act (ESA) by failing to comply with Section 7 of the ESA, which requires that all federal agencies engage in consultation with the U.S. Fish and Wildlife Service (FWS) and/or National Marine Fisheries Service (NMFS) to ensure that their programs and other actions do not jeopardize endangered or threatened species or impair their critical habitats. 16 U.S.C. § 1536(a)(2).

2.      Through the America's Marine Highway Program, MARAD has promulgated regulations intended to expand the use of the Marine Highway System and has awarded millions of dollars in grants for the expansion of vessel traffic on rivers, bays, and coastal areas. MARAD

recently announced that it is making an additional $10,819,000 available for grants to fund Marine Highway projects in 2021.

3.     Many of the projects funded by MARAD are in habitat for ESA-listed species. This includes the James River Container Expansion Project, a MARAD-designated Marine Highway Project that was awarded a $1,822,093 grant in 2018 for the acquisition of a barge to expand vessel service in the James River and to initiate a new container shuttle service in the Hampton Roads area. This project has applied for additional funding under the 2021 round of grants. The James River is designated critical habitat for the Chesapeake Bay distinct population segment of Atlantic sturgeon, and these endangered fish are highly susceptible to ship strikes, particularly in the James River. Collisions with vessels are considered to be a major threat to this subpopulation.

4.     The James River Expansion Project is one of many such actions funded by MARAD across the country through the America's Marine Highway Program. The creation and expansion of a nationwide network of designated Marine Highways under MARAD's America's Marine Highway Program and the increase in vessel traffic on Marine Highways from MARAD grants certainly "may affect" listed species that rely on those waterways—the low threshold for requiring ESA Section 7 consultation. 50 C.F.R. § 402.14(a). Indeed, several of the projects funded by MARAD over the past few years and/or that have applied for funding under the 2021 grants demonstrate that the America's Marine Highway Program adversely affects protected species.

5.     However, MARAD has failed to initiate and complete ESA Section 7 consultation with the FWS and/or NMFS (together, the "Services") on the James River Expansion Project or other such Marine Highway Projects it has funded that pose risks to listed species. Nor has it

engaged in programmatic consultation to assess the cumulative effects of its actions on listed species and to guide the implementation of the America's Marine Highway Program as a whole, as the ESA requires.

6.     Both project-specific and programmatic ESA consultation are vital for ensuring that MARAD fully considers the impacts to imperiled wildlife when administering the America's Marine Highway Program. The applicable regulations in fact require consultation at both the programmatic and project-specific stages for the America's Marine Highway Program. *See* 50 C.F.R. § 402.14(c)(4) (project-specific consultation "does not relieve the Federal agency of the requirements for considering the effects of the action as a whole").

7.     Project-specific consultation is required for any action authorized or *funded* by an agency that may affect listed species, such as the purchase of vessels funded by MARAD grants on the James River. The consultation process has been referred to as the "heart" of the ESA and is required in order to effectuate the ESA's substantive mandate that agencies prevent jeopardy to imperiled wildlife and avoid the destruction of critical habitat. 16 U.S.C. § 1536(a)(2).

8.     For federal programs that affect listed species, such as the America's Marine Highway Program, programmatic consultation is required to allow the Services to establish standards, guidelines, and governing criteria to avoid or minimize the effects of the program by instituting protocols to track and respond to the collective impacts of the program. This programmatic review provides the only way to avoid piecemeal destruction of species and habitat. That is because the aggregate impacts of the Program can be analyzed and meaningfully addressed only through programmatic review, which is necessary to ensure the effects of the program as a whole do not jeopardize listed species through death by a thousand small cuts.

9. MARAD, however, has never consulted on the James River Expansion Project and has failed to undertake programmatic consultation on the America's Marine Highway Program. The agency has therefore failed to fulfill its duty under the ESA to ensure that its actions will not jeopardize imperiled species.

10. Plaintiff therefore seeks a declaration that MARAD is in violation of ESA Section 7, a date certain by which MARAD must complete the required consultations with the Services, and any other appropriate relief.

## JURISDICTION AND VENUE

11. This case arises under the ESA, 16 U.S.C. §§ 1531-1544 and the Court has jurisdiction under the ESA citizen suit provision, 16 U.S.C. §§ 1540(c), (g).

12. By written notice to Defendants dated July 27, 2021, Plaintiff provided notice of intent to file suit more than sixty days prior to the filing of this complaint, as required by the ESA. 16 U.S.C. § 1540(g). Plaintiff's notice letter demanded that Defendants initiate and complete project-specific and programmatic ESA consultation on the America's Marine Highway Program. Defendants failed to respond or remedy the alleged violations, and therefore an actual, justiciable controversy exists within the meaning of 28 U.S.C. § 2201(a).

13. Venue is appropriate in this Court under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

### Plaintiff

14. Plaintiff Center for Biological Diversity (the Center) is a national nonprofit conservation organization that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center has 89,610 members and

more than 1.6 million online supporters worldwide. The Center has worked for decades to safeguard water and aquatic habitats for people, plants, and animals. The Center's members and staff value and benefit from rare species' continued existence in the wild and are harmed by industrial development and associated trends like global climate change and water degradation that threaten wild species' survival and recovery. The Center has worked for years to protect imperiled species that may be harmed by the America's Marine Highway Program, including imperiled fish, whales, turtles, birds, and mussels that rely on rivers, bays, and coastal areas that are crossed by Marine Highway Projects.

15.     In bringing this lawsuit, Plaintiff advocates for the interests of its members who live, work, and recreate in places affected by MARAD's Marine Highway Projects and who use, study, and cherish the land, water, wildlife, and other resources that will be irrevocably damaged by MARAD's activities, including increasing vessel traffic on Marine Highways.

16.     MARAD's America's Marine Highway Program has been, and will continue to be, used to fund activities across the country that increase vessel traffic on waterways that provide essential habitat for protected species, thereby adversely affecting areas that people and wildlife rely on, including members of the Center.

17.     The Center has members whose interests are adversely affected by direct, indirect, and cumulative harm from MARAD's Marine Highway Program to aquatic areas that such members use and enjoy, including areas that are habitat for ESA-listed wildlife. For example, increasing vessel traffic on MARAD-designated Marine Highways, such as the Missouri, Hudson, Columbia, and James Rivers, increases the risk of ship collisions and wake strandings for ESA-listed sturgeon and salmon, resulting in direct mortality that undermines protection and recovery efforts that Plaintiff and its members have long been engaged in.

18.     Plaintiff's members have researched, studied, observed, and sought protection for endangered species that are adversely affected—and whose survival and recovery are threatened—by America's Marine Highway Program activities, including increased vessel traffic on the James River and other Marine Highways. Plaintiff's members and staff have visited and observed or sought out threatened and endangered species that are imperiled by the America's Marine Highway Program, and enjoy hiking, fishing, and observing wildlife in wetlands, along rivers and streams, and in coastal areas that are impacted by MARAD-funded activities, including increased vessel traffic on MARAD-designated Marine Highways. Plaintiffs' members intend to continue to visit and observe, or attempt to visit and observe, these species in the near future.

19.     The Center has many members that live near and/or regularly recreate on the James River. Center members include individuals that routinely visit the James River to kayak, paddleboard, sail, or otherwise recreate on the river, and who seek out and enjoy imperiled wildlife, including fish, that rely on the James River. For example, one Center member has a long-held interest in protecting the habitat of the James River, lives just adjacent to the river on a small tributary, and spends considerable time on the river with his family. This member intends to continue using the river for recreation and wildlife viewing on an ongoing basis in the future. Another Center member that is pursuing a PhD in wildlife conservation has a long history of visiting the James River with her family and has concrete plans to continue to visit the river in the future to seek out and enjoy the wildlife and wildlife habitat in the river, including habitat of the Atlantic sturgeon and other protected species. Increasing vessel traffic on the James River adversely affects these and other members' scientific, recreational, spiritual, emotional, and aesthetic interests in the James River.

20.     The Center's members also include individuals who study and advocate for various threatened and endangered species, and whose interests in studying and enjoying these species and their habitats are entirely dependent on the continued existence of such species. Any action that interferes with and/or harms these species also harms those members' interests and enjoyment in studying those species. Any loss of individual species or habitat from the America's Marine Highway Program activities would hamper their ability to undertake such research in the future, thereby harming their academic and aesthetic interests in those species.

21.     For example, one of the Center's members is a fish biologist and university professor whose work involves understanding the life history characteristics—such as population dynamics, abundance, distribution, and recruitment—of endangered and threatened sturgeon, such as those in the James River and several other rivers affected by the America's Marine Highway Program. This professor has spent much of his professional life studying sturgeon and plans to continue to study these species and write books and articles about them. His ability to study and enjoy imperiled sturgeon and their habitats is entirely dependent on the continued existence of the species, and therefore any loss of individual sturgeon and degradation of sturgeon habitat would hamper his ability to undertake research in the future, thereby harming his academic and aesthetic interests in these species.

22.     The Center also has other members with a direct interest in protecting Marine Highways and the habitat they provide. For example, one of the Center's members has a long history of protecting the Missouri River, including as the chair of the Missouri Clean Water Campaign, which is involved in protecting and restoring endangered aquatic/riverine species individuals and populations in the Missouri River. This member regularly visits the Missouri River for fishing and wildlife viewing and plans to continue to do so into the future. He has

dedicated much of his life to protecting the Missouri River system, and therefore any action that harms the river or the species that rely on it adversely affects his professional, aesthetic, and recreational interests in the preservation of the Missouri River system and the habitat it provides, both for listed and non-listed species.

23.    MARAD's issuance of grants under the America's Marine Highway Program—including grants to increase large vessel traffic on the James River and other rivers and coastal areas where ESA-listed species are present—demonstrates that this program has adversely affected, and will continue to adversely affect, wildlife that rely on Marine Highways, thereby harming the interests of Plaintiffs' members who live near, study, and/or enjoy areas affected by such activities.

24.    As a result, MARAD's Marine Highway Program threatens waters that members use and enjoy both as a resource and for the habitat they provide for plants and animals. The negative ecological effects of increased vessel traffic on Marine Highways interferes with members' use and enjoyment of those waterways and the wildlife they support.

25.    Plaintiff's members derive scientific, recreational, spiritual, and aesthetic benefits from imperiled species' existence in the wild. Their interest in maintaining the species inhabiting rivers, streams, and wetlands that may be affected by the America's Marine Highway Program is entirely dependent on the continued existence of healthy, sustainable, and accessible ecosystems and populations. Any activities that "may affect" or destroy, degrade, or diminish these areas, or that kill, injure, harm, harass, or displace populations of listed species, interfere with the Center's members' use and enjoyment of the areas and species.

26.    MARAD's failure to ensure, through ESA consultation, that the James River Expansion Project and the America's Marine Highway Program as a whole will not jeopardize

protected species directly and irreparably injures Plaintiff's interests in such species. MARAD's failure to comply with the requirements of the ESA delays, avoids, and undermines protections that are necessary to secure Plaintiff's interests in the existence of listed species and their critical habitat.

27.     MARAD's failure to comply with the ESA means that Plaintiff and its members may never even learn about—let alone be in a position to seek to ameliorate—the impacts of Marine Highway projects on listed species and critical habitats of vital interest to Plaintiff and its members.

28.     Plaintiff has also suffered procedural injury from Defendants' failure to comply with Section 7 of the ESA. Because compliance with the Section 7 consultation process is essential to protect listed species and critical habitats as to which the Center's members have concrete interests, Defendants' failure to comply with Section 7 is causing current and ongoing harm to Plaintiff's substantive recreational, scientific, spiritual, and aesthetic interests. The Center relies on Defendants' compliance with Section 7 to achieve the Center's organizational purposes on behalf of itself and its members, including monitoring the impacts of agency actions on the environment and listed species; monitoring legal compliance concerning environmental management; educating members, directors, staff, and the public concerning species management and the state of the environment; and advocating for policies that protect habitats and wildlife.

29.     Plaintiff is a non-profit conservation organization with limited resources that can be dedicated to its core mission to protect the environment, imperiled species, and the habitats they rely on. Defendants' actions impede Plaintiff's ability to carry out its fundamental mission,

and directly undercuts decades of successful work by Plaintiff to enforce environmental laws that protect waterways and listed species.

30.     Defendants' failure to comply with the ESA is causing actual, concrete injuries to the Center and its members. The interests and organizational purposes of the Center and its members are directly and irreparably injured by Defendants' violations of law as described in this Complaint. Unless this Court grants the requested relief, harm to the environment and protected species will continue to accrue, and the aesthetic, recreational, educational, professional, scientific, spiritual, and conservation interests of Plaintiff and its members will continue to be adversely affected.

31.     The relief Plaintiff seeks in this lawsuit will redress its injuries by requiring MARAD to comply with the ESA. This relief will protect Plaintiff's interests by ensuring that listed species will not be jeopardized by the James River Expansion Project and the America's Marine Highway Program, as the ESA requires, and give Plaintiff and its members more comprehensive and complete information regarding the Program's threats to waterways, protected species, and other valued resources. It will allow Plaintiff, its members and supporters, and others who are concerned about such activities, to participate and advocate more effectively for changes to mitigate the adverse impacts of the America's Marine Highway Program.

**Defendants**

32.     Defendant United States Maritime Administration (MARAD) is the federal agency that oversees the America's Marine Highway Program. MARAD is within the U.S. Department of Transportation. MARAD's purpose is to increase the utilization of domestic freight or passenger transportation on marine highway routes between U.S. ports. As part of the America's Marine Highway Program, MARAD promulgates regulations, designates Marine

Highways and Projects, and awards grants for these Projects that increase vessel traffic on Marine Highways.

33.     Defendant Pete Buttigieg is the Secretary of Transportation and has authority over MARAD, which is within the Department of Transportation. Plaintiff brings this action against Secretary Buttigieg in his official capacity only.

34.     Defendant Lucinda Lessley is the Acting Administrator of MARAD. Plaintiff brings this action against Mrs. Lessley in her official capacity only.

## LEGAL BACKGROUND

### The Endangered Species Act

35.     With the ESA, Congress intended endangered species to be afforded the highest of priorities. The ESA's purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

36.     The ESA assigns responsibility to implement the statute to the Secretaries of Commerce and Interior, which in turn have delegated responsibility to the National Marine Fisheries Service and the U.S. Fish and Wildlife Service, respectively. 50 C.F.R. § 402.01.

37.     To fulfill the substantive purposes of the ESA, federal agencies are required to engage in Section 7 consultation with the Services to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical." 16 U.S.C. § 1536(a)(2). To "jeopardize" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of . . . the survival [or] recovery of a listed

species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

38.     The ESA's regulatory definition of "action" is broad and includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas," such as the promulgation of regulations, the granting of "grants-in-aid," or any actions directly or indirectly causing modifications to the land, water, or air. *Id*.

39.     Section 7(a)(2) and its implementing regulations set forth a detailed process that must be followed before agencies take or approve actions that may affect threatened or endangered species or critical habitat. In fulfilling the requirements of Section 7(a)(2) and the procedural requirements set forth in 50 C.F.R. Part 402, agencies must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

40.     Each federal agency must "review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat" in the action area and thus whether consultation is required. 50 C.F.R. § 402.14(a). The term "may affect" is broadly construed to include "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character," and thus is easily triggered. 51 Fed. Reg. 19,926, 19,949 (June 3, 1986). The "action area" includes all areas that would be "affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02.

41.     Pursuant to Section 7, if listed species or critical habitat may be present in the action area, the agency must analyze the proposed action's effects. It may do so by first engaging in "informal consultation" with the Service(s). *See* 50 C.F.R. §§ 402.12, 402.13, 402.14(b)(1). If the agency concludes, in a biological assessment, that the action is "not likely to adversely

affect" listed species—and the Service lawfully concurs in writing—then the consultation

process is completed. *Id.* § 403.13(c). Conversely, if the action is "likely to adversely affect"

listed species, the agency must enter into "formal consultation" with the Service(s), a more

extensive and protective process to consider the action's impacts. *Id.* §§ 402.12(k), 402.14(a).

42.     Formal ESA consultation commences with the action agency's written request for

consultation and concludes with the Services' issuance of a "biological opinion." *Id.* §§ 402.02;

402.14(c), (g)(4). During formal consultation, the Services and the action agency must evaluate

the "[e]ffects of the action," including all direct and indirect effects of the proposed action, plus

the effects of actions that are interrelated or interdependent, added to all existing environmental

conditions—that is, the "environmental baseline." *Id.* §§ 402.02, 402.14(g)(3). "The

environmental baseline includes the past and present impacts of all Federal, State, or private

actions and other human activities in the action area . . . ." *Id.* § 402.02. The effects of the action

must be considered together with "cumulative effects," which are "those effects of future State or

private activities, not involving Federal activities, that are reasonably certain to occur within the

action area of the Federal action subject to consultation." *Id.*

43.     The biological opinion is the heart of the formal consultation process and states

the Services' opinion as to whether the effects of the action are "likely to jeopardize the

continued existence of listed species or result in the destruction or adverse modification of

critical habitat." *Id.* § 402.14(g)(4), (h)(3); *see* 16 U.S.C. § 1536(a)(2), (b)(3)(A).

44.     If the Services determine that the action is likely to jeopardize a species, the

biological opinion must outline "reasonable and prudent alternatives" to the action, if any exist,

that will avoid jeopardy and "which [the agency] believes would not violate [Section 7(a)(2)]."

16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). The Services may also "suggest

modifications" to the action during the course of consultation "to avoid the likelihood of adverse

effects" to the listed species even when not necessary to avoid jeopardy. 50 C.F.R. § 402.13(b).

45.     For Federal programs that may affect listed species, such as the America's Marine

Highway Program, agencies must also engage with the Services in "programmatic consultation"

to guide the implementation of such programs by establishing standards, guidelines, or governing

criteria to avoid, minimize, or offset the effects of the program on listed species and critical

habitat, and to establish protocols to track and respond to the collective impacts of actions taken

pursuant to the program. *See* 50 C.F.R. § 402.02; *id.* § 402.14(c)(4) (requiring Federal agencies

to consider "the effects of the action or actions as a whole"). The Services' regulations provide

that for federal programs, programmatic consultations and project-specific consultations work in

tandem, with each playing a vital role in protecting imperiled species. *See* 84 Fed. Reg. 44,976,

44,997 (Aug. 27, 2019).

## FACTUAL BACKGROUND

## The America's Marine Highway Program

46.     The America's Marine Highway Program was established by the Energy

Independence and Security Act of 2007. 46 U.S.C. § 55601. The purpose of the Program is to

"encourage the use of marine highway transportation through the development and expansion of

- 1) vessels . . .; 2) shipper utilization; 3) port and landside infrastructure; and 4) marine

transportation strategies by State and local government." *Id.* § 55601(b). The Program includes

not only promoting the development of marine highway transportation services, but also the

development of "performance measures for the marine highway transportation program." *Id.* §

55601(e). The statute further requires the Secretary to "establish and implement a marine

highway transportation grant program to implement projects" designated by the Secretary. *Id*. §55601(g)(1).

47.     MARAD's stated purpose is to increase the utilization of domestic freight and passenger transportation on marine highway routes between U.S. ports. Indeed, MARAD states on its website that it has "one major goal: expand the use of America's navigable waters."

48.     MARAD achieves this goal through the America's Marine Highway Program, under the auspices of which it promulgates regulations through rulemakings, designates specific Marine Highway Routes, and provides funds for designated Marine Highway Projects across the country through grants that expand the use of the Marine Highway System.

49.     The Marine Highway System, as created by MARAD, includes 26 designated "Marine Highway Routes":



50.     These Marine Highways are used as an alternative to "landside" shipping and transportation options for people and bulk commodities, including things like grain, steel, coal, and oil.

51.     Through the America's Marine Highway Program, MARAD provides grants to private companies, state and local governments, and port authorities to fund the expansion of vessel traffic on Marine Highways, including funding the purchase of barges or other vessels and equipment, and studies to increase the viability and use of Marine Highways.

52.     These grants are available only for MARAD-designated Marine Highway Projects. Since its inception, MARAD has designated 46 Marine Highway Projects, many of which are in Marine Highway Routes that provide habitat for ESA-listed species. MARAD announced on August 19, 2021, that it has designated six new Maine Highway Projects and one new Marine Highway Route.

53.     Through the America's Marine Highway Program, MARAD has provided tens of millions of dollars in grants over the past 11 years for Marine Highway Projects, and just recently announced that it is making an additional $10,819,000 available for grants to fund Marine Highway Program projects—applications for which were due June 25, 2021.

54.     In 2014, MARAD provided notice in the Federal Register that it had prepared a draft Programmatic Environmental Assessment (2014 DPEA) "to evaluate potential environmental impacts associated with the execution of the 'America's Marine Highway' Program, in compliance with the National Environmental Policy Act." 79 Fed. Reg. 40838 (July 14, 2014). The notice states that "the program provides a set of tools for use by ports, state and local governments, and private industry to consider expansion of [America's Marine Highway] services," and that "MARAD envisions that additional environmental analyses of the federal

16

aspects of future project and service development along designated [America's Marine Highway] routes will be necessary." *Id*. MARAD does not appear to have published a final Programmatic Environmental Assessment, but it did issue a finding of no significant impact on September 9, 2014.

### The James River Container Expansion Project

55.    In 2010, MARAD designated the James River Container Expansion Project on Marine Highway Route M-64. In 2018, MARAD awarded a grant of $1,822,093 to the James River Barge Line (Sponsored by Virginia Port Authority) to acquire a barge to expand service in the James River and to initiate a new container shuttle service in the Hampton Roads area. This project has applied to MARAD for additional funding under the latest round of America's Marine Highway Program grants.

56.    The James River is designated critical habitat for the Chesapeake Bay distinct population segment of Atlantic sturgeon. These endangered fish are highly susceptible to ship strikes, particularly in the James River. This issue has been the subject of several studies, documenting dozens of Atlantic sturgeon ship strikes in the James River that resulted in direct mortalities.

57.    In its 2007 Status Review for Atlantic sturgeon, NMFS stated that vessel strikes in the James River are "considered to be a major threat" to the subpopulation, and noted that vessels routinely strike sturgeon in the James River, which is "more prone to ship strikes" because it has "large ports and [a] relatively narrow waterway," and that in these small subpopulations "the loss of any spawning adults could have a substantial impact on recovery."

17

### Impacts to Listed Species from the America's Marine Highway Program

58.     MARAD-designated Marine Highway Routes include habitat—including designated critical habitat—for many listed species. This includes, for example, North Atlantic right whales and loggerhead sea turtles along the M-95 corridor; Atlantic and shortnose sturgeon in the Hudson River; Atlantic sturgeon in the James River; imperiled freshwater mussels in the Tennessee Tombigbee Waterway, Black Warrior & Tombigbee Rivers, and Ohio River; steelhead, chinook salmon, chum salmon and bull trout in the Columbia River and Snake River; humpback whales, blue whales, fin whales, sperm whales, and leatherback sea turtles along the Pacific coast; longfin and delta smelt, steelhead, and green sturgeon in the San Francisco Bay, San Pablo Bay, Carquinez Strait and San Joaquin River; humpback whales and stellar sea lions in the Gulf of Alaska; and pallid sturgeon in the Mississippi River and Missouri River.

58.     MARAD's 2014 DPEA acknowledges in several places that Marine Highway Services supported by the America's Marine Highway Program "have the potential to affect populations and habitats of federally protected species" because of the proximity of marine species and migratory pathways, and it lists dozens of ESA-listed species across the country that occur in waterways affected by the Program.

59.     The America's Marine Highway Program is specifically intended to expand the use of rivers, bays, channels, and coastal zones by investing in infrastructure—including vessels, such as barges, and other expanded service—thereby increasing the industrial use of waterways that are relied upon by listed species.

60.     The escalation of vessel traffic directly attributable to MARAD's America's Marine Highway Program and the grants awarded under that program increases the risk of harm to imperiled species that rely on affected waterways by increasing the risk of ship strikes (i.e.,

18

collisions), entrainment (i.e., passage of fish through a ship's water intake), strandings (i.e., vessel wake causing fish to be washed ashore), and spills of contaminants such as oil and gas.

61.     Specific Marine Highway Projects that have been funded by America's Marine Highway Program grants over the past several years—in addition to the James River Expansion Project discussed above—demonstrate the risks that the Program poses to listed species. The Program therefore meets the ESA's "may affect" threshold for ESA Section 7 consultation. Such projects include the following:

62.     Port of Morrow Barge Service Expansion: Grants were awarded in 2019 ($1,623,200) and 2020 ($3,200,000) for the expansion of barge services on the Columbia River (M-84). Those projects increased barge capacity in areas that are designated critical habitat for several listed species, including Lower and Middle Columbia River DPS Steelhead, Lower Columbia River DPS Chinook Salmon; Columbia River DPS Chum Salmon; and Bull Trout. These species are adversely affected by wake stranding from large vessel traffic.

63.     New York Harbor Container and Trailer-on-Barge Service: MARAD issued a $308,000 grant in 2020 to the U.S. Coastal Service, Inc. for planning, permitting, and engineering studies intended to start and/or expand Trailer-on-Barge operations in the New York City area – particularly in the Hudson River (M-95). The Hudson River is designated critical habitat for Atlantic sturgeon, as well as home to endangered shortnose sturgeon. These sturgeon are known to be susceptible to ship strikes, which can adversely affect their recovery and continued existence. According to NMFS' Species Directory for Atlantic sturgeon, "[t]he risk of injury and mortality can be high in areas with high ship traffic, *including the Hudson*."

64.     St. Louis area Container-on-Barge service: In 2020, MARAD awarded a $1,268,800 grant to America's Central Port District to purchase equipment necessary to support

and expand the container on barge service in the St. Louis area of the Mississippi River (M-55), in habitat for pallid sturgeon. Barges pose a significant threat to pallid sturgeon in the Mississippi River. The Recovery Plan for the species acknowledges that threats to pallid sturgeon include vessel propellers, which "can entrain and harm Pallid Sturgeon."

65.     Baton Rouge-New Orleans Shuttle: MARAD awarded a $3,155,622 grant in 2018 and a $1,040,000 grant in 2019 to SEACOR AMH for the purchase of vessels, including barges and towboats to transport containers, for service on the Mississippi River (M-55), in habitat for pallid sturgeon. As set forth above, NMFS has determined that one of the threats to the recovery of the endangered pallid sturgeon is ship strikes and entrainment from such vessels.

66.     Barge Service in the Ports of Cincinnati, Northern Kentucky, and Beyond: In 2020, MARAD awarded $545,136 to the Ports of Indiana to construct a new storage facility and support expansion of service between Ghent, KY and the Port of Indiana-Jeffersonville, IN on the Ohio River (M-70). The affected stretch of the Ohio River contains ESA-listed freshwater mussels, including threatened rabbitsfoot and endangered pink mucket pearlymussel. FWS has acknowledged that the habitats of freshwater mussels are vulnerable to water quality degradation and habitat modification from adjacent development, including siltation from construction projects along waterways. The increase in vessel traffic attributable to the MARAD grant also increases the potential for contaminants to be introduced into the Ohio River, including heavy metals and fuel/oil that can harm listed mussels.

67.     On May 24, 2021, MARAD announced a new round of funding, with nearly $11 million available for America's Marine Highway Program grants. Applicants for the 2021 MARAD grants include projects (besides those noted above) that may affect listed species, including the following:

68.    <u>Expanded Container-on-Barge Service in North Carolina</u>: This project seeks to expand barge services between Edenton, NC, and locations within the Port of Virginia. Container on barge services along the M-95 and M-65 marine highway routes pose a significant risk to Atlantic sturgeon in the Roanoke River and James River. As set forth above, Atlantic sturgeon are known to be adversely affected by such boat traffic.

69.    <u>Chambers County Houston Container on Barge Expansion Service</u>: This project would expand cargo-by-barge services in the Houston Ship Channel, between Chambers County and the Port of Houston, using the M-146 and M-10 marine highway routes. This would increase vessel traffic in areas that are designated critical habitat for loggerhead sea turtles, which may be killed or injured from collisions with boat hulls and propellers.

70.    <u>Fernandina Express M-95 Container on Barge Service</u>: This container on barge service, out of the Port of Fernandina in Florida, is intended to "service all coastal seaports located along the Atlantic seaboard," including the port of Savanah, which is termed a "mega-hub" since it is a major connection point for various vessel traffic. This project implicates listed species along the Atlantic coast, including critical habitat for endangered North Atlantic right whales. Vessel strikes are a major threat to right whales, and their habitat and migration routes are close to major ports along the Atlantic coastline and overlap with shipping lanes.

71.    <u>Mid Atlantic Barge Service Project</u>: This project would expand barge services between Hampton Roads, VA, Baltimore, MD, and Philadelphia, PA, in areas that are critical habitat for Atlantic sturgeon. As set forth above, Atlantic sturgeon are known to be adversely affected by such boat traffic.

72.    In addition, MARAD's Marine Highway Program is adversely affecting listed species by contributing to the global climate crisis, including by subsidizing the use of Marine

Highway routes through grants that expand service for fossil fuel transport, such as coal and petroleum products. MARAD's grants allow for increased transport of fossil fuels that are contributing to the decline of imperiled wildlife by altering the ecosystems on which they depend.

73.     On July 2, 2021, the Center submitted a Freedom of Information Act request to MARAD seeking any records regarding ESA Section 7 consultation for the Marine Highway Program. MARAD failed to provide any documents indicating that is has initiated ESA Section 7 consultation on projects funded through the America's Marine Highway Program that may affect listed species, nor has the agency undertaken programmatic ESA consultation on the America's Marine Highway Program.

74.     Although MARAD never consulted with the Services, NMFS did provide a letter to MARAD stating that the Program would "result in vessels traveling through the areas of known distribution of animals protected under the ESA and/or the [Marine Mammal Protection Act] and could result in effects to these species. If the project would result in an increase in the number of ships or change in the location of ship traffic, we would have concerns about an increase in the risk of ship strikes. . . ."

## FIRST CLAIM FOR RELIEF

### Violations of the Endangered Species Act, 16 U.S.C. §§ 1531-1544, and applicable regulations

75.     Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

76.     MARAD has a duty pursuant to ESA Section 7(a)(2) to ensure that its actions are not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of such species critical habitat. 16 U.S.C. § 1536(a)(2).

To fulfill this duty, MARAD must initiate and complete project-specific ESA Section 7 consultation on the James River Expansion Project, as well as programmatic consultation on the America's Marine Highway Program.

77.     MARAD's grants and other efforts to expand vessel traffic on the James River certainly "may affect" listed species. Vessel strikes with endangered Atlantic sturgeon are well documented on the James River, and these collisions are not only considered to be a major threat to the subpopulation, but NMFS has stated that increased vessel traffic could have a substantial impact on recovery of the species. MARAD's issuance of grants are specifically intended to increase such vessel traffic, and therefore MARAD must initiate and complete consultation to ensure that the increase in vessel traffic on the James River attributable to the MARAD grants will not jeopardize listed species or destroy their critical habitat, as the ESA requires.

78.     MARAD must also consult on the America's Marine Highway Program as a whole. 50 C.F.R. § 402.14(c)(4). The Program is specifically intended to expand, and does expand, the use of rivers, bays, channels, and coastal zones by providing grants for infrastructure—including vessels, such as barges, and other expanded service—thereby increasing the use of waterways that are relied upon by listed species.

79.     Through the America's Marine Highway Program, MARAD promulgates regulations and provides "grants-in-aid," thereby funding activities that result in direct harm to listed species from ship strikes, entrainment, strandings, spills of contaminants such as oil and gas, as well as indirect impacts associated with climate change.

80.     MARAD's adoption and continued implementation of the America's Marine Highway Program is therefore an agency action that "may affect" listed species, and MARAD is required to undertake programmatic ESA Section 7 consultation to analyze the additive effects of

the program on listed species, in order to avoid piecemeal destruction of habitat that may

jeopardize species in violation of ESA Section 7.

81.     Programmatic consultation on the America's Marine Highway Program is

necessary to afford the Services the opportunity to identify where grants or other actions taken

by MARAD may be problematic for listed species or critical habitat, and to provide reasonable

and prudent measures to minimize take, such as measures to ensure that MARAD gathers and

analyzes sufficient data to prevent jeopardy to listed species, and to ensure that incidental take

does not occur at unsustainable levels.

82.     MARAD's failure to undertake and complete project-specific consultation on the

James River Expansion Project and programmatic consultation with the Services on the

America's Marine Highway Program as a whole constitutes a failure to ensure, as mandated by

the ESA, that MARAD's actions are not likely to jeopardize the existence of listed species or

result in destruction or adverse modification of critical habitat, in violation of Section 7 of the

ESA, 16 U.S.C. § 1536, and the ESA's implementing regulations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a)     Declare MARAD's Marine Highway Program to be in violation of the ESA and applicable

regulations;

b)     Order Defendants to initiate ESA Section 7 consultation regarding the James River

Expansion Project and programmatic consultation on the Marine Highway Program, and to

complete such consultations according to a schedule established by the Court;

c)     Award Plaintiffs their costs, expenses, and attorneys' fees under applicable law; and

d)     Provide for such other relief as the Court deems just and appropriate.

24

Dated: October 12, 2021                 Respectfully submitted,

                                         */s/ Hannah Connor*
                                         Hannah Connor (VSB # 74785)
                                         Center for Biological Diversity
                                         1411 K Street NW, Suite 1300
                                         Washington, DC 20005
                                         Tel: (202) 681-1676
                                         Email: hconnor@biologicaldiversity.org

                                         Jared Margolis (*pro hac vice* pending)
                                         Center for Biological Diversity
                                         2852 Willamette St. # 171
                                         Eugene, OR 97405
                                         Tel: (802) 310-4054
                                         Email: jmargolis@biologicaldiversity.org

                                         *Attorneys for Center for Biological Diversity*