IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES MARITIME ADMINISTRATION, PETE BUTTIGIEG, in his official capacity, and LUCINDA LESSLEY, in her official capacity,<br><br>Defendants. | Civil Action No.: 4:21-cv-132 |

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

The Maritime Administration ("MARAD") oversees the America's Marine Highway Program ("AMHP"), which encourages the use of water transportation routes for freight travel in an effort to reduce overland transportation near coastal regions. The AMHP includes marine highway routes designated by the Secretary of Transportation ("Secretary") that vessels can use to transport freight. The AMHP also includes several projects that are designed to support the marine highway routes. The James River Container Expansion Project ("James River Project"), for example, supports the M-64 marine highway route in Virginia.

In its complaint, Plaintiff only alleges a single claim: that MARAD has not initiated and completed consultation pursuant to Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2). Complaint, ECF 1 at 22-24. However, Plaintiff raises two different arguments relating to this claim: (1) that MARAD has failed to conduct a programmatic ESA Section 7 consultation on the AMHP; and (2) that MARAD has failed to conduct project-specific ESA

1

Section 7 consultation on the James River Project.  *Id.* ¶ 75-82.  Both of Plaintiff's arguments lack merit, and therefore its claim fails.

Regarding Plaintiff's first argument, MARAD was not required to conduct ESA Section 7 consultation during the creation of the AMHP.  The establishment of the AMHP is not an "action" as defined by the ESA's implementing regulations that triggers a duty to conduct consultation.  *See* 50 C.F.R. § 402.02.  But even if the establishment of the AMHP somehow met the definition of "action" under the ESA (which it does not) and consultation was required, the ESA does not require MARAD to conduct the programmatic consultation that Plaintiff envisions.

As for Plaintiff's second argument, the Court lacks jurisdiction to adjudicate Plaintiff's claim as it relates to the James River Project.  First, to the extent Plaintiff is challenging the Secretary's designation of the James River Project itself,[1] it did not provide adequate notice in its notice of intent to sue under the ESA's citizen suit provision.  *See* Plaintiff's Notice of Intent to Sue, AR 016706-17.  Second, the designation of the James River Project is not a final agency action that is judicially reviewable under the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 704.  Third, the claim would fail on its merits as the designation of a marine highway project is not an "action" as defined by the ESA's implementing regulations such that MARAD was required to conduct ESA consultation on the designation.  *See* 50 C.F.R. § 402.02.

Even assuming Plaintiff is challenging particular grant agreements that have previously received funding for the James River Project rather than the designation of the James River Project

---

[1] The complaint is not clear on whether Plaintiff is challenging the Secretary's designation of the James River Project or the individual grant agreements that were funded for the Project.  *Compare* Complaint, ECF 1 ¶ 26 ("MARAD's failure to ensure, through ESA consultation, that the James River Expansion Project . . . will not jeopardize protected species directly and irreparably injures Plaintiff's interests"); *with id.* ¶ 77 (stating that the individual grant proposals the funded the James River Project "and other efforts to expand vessel traffic" may affect listed species and ESA consultation was required).  Therefore, Defendants will address both arguments.

itself, the second part of Plaintiff's claim still fails because Plaintiff's claim is not redressable and thus they lack standing to raise it. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (the "irreducible constitutional minimum" of Article III standing includes having a claim that can be redressed by this Court). In addition, MARAD is not "in violation" of the ESA, which is a mandatory requirement for Plaintiff to bring a citizen suit claim under the ESA. *See* 16 U.S.C. § 1540(g)(1)(A).

For these reasons, the Court should grant Defendants' motion for summary judgment and deny Plaintiff's motion for summary judgment.

## LEGAL BACKGROUND

### I.  The Energy Independence and Security Act of 2007 and the Establishment of the AMHP

The Energy Independence and Security Act of 2007 directed the Secretary to "establish a marine highway transportation program to be known as the 'America's Marine [H]ighway [P]rogram.'" 46 U.S.C. § 55601(a). The purpose of the AMHP is to "provide a coordinated and capable alternative to landside transportation or to promote marine highway transportation. *Id.* MARAD, an operating administration within the U.S. Department of Transportation ("DOT"), issued a final rule establishing the AMHP in 2010. America's Marine Highway Program, 75 Fed. Reg. 18,095 (Apr. 9, 2010). The rule stated that the AMHP will include the development of marine highway routes, identification and support of specific marine highway projects, the integration of the marine highway into the transportation planning process, and research to improve efficiencies and environmental sustainability. *Id*. at 18,096. "Marine highway routes" are water transportation routes designated by the Secretary that are used to relieve landside congestion along coastal corridors by transporting freight or promoting marine highway transportation. *See* 46 U.S.C. §

55601(c); 46 C.F.R. § 393.1(e); 46 C.F.R. § 393.2(a).  A "marine highway project" is a new or expanded service that provides support for a marine highway route.  *See* 46 C.F.R. § 393.1(f).

Both marine highway routes and marine highway projects are proposed by a project applicant, which are public entitles like state governments and port authorities.  *See id.* § 393.1(g), (i).  The final rule explained what information project applicants must provide and what criteria projects must meet to receive a designation as a marine highway route or marine highway project from the DOT.  75 Fed. Reg. at 18,103-06.  After a marine highway route is designated, applicants may request the designation of marine highway projects along that route.  Only after a project is designated may an applicant submit a grant proposal to apply for future funding that could become available to implement the designated project.  The facts relevant to the grant proposal and grant agreement at issue in this case are discussed in the factual background section below.

## II.    The ESA

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b). Congress directed the Secretaries of Commerce and Interior to list endangered and threatened species and designate listed species' critical habitats.[2]  16 U.S.C. § 1533(a)(1).  An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range," *id.* § 1532(6), and a "threatened species" is "any species which is likely to become an

_____

[2] The Secretary of Commerce is generally responsible for marine and anadromous species, while the Secretary of the Interior is generally responsible for terrestrial species and inland fishes.  The Secretary of Commerce and Secretary of the Interior have delegated their ESA responsibilities to National Marine Fisheries Service ("NMFS") and the United States Fish and Wildlife Service ("FWS"), respectively.  *See* 50 C.F.R. § 402.01(b).

endangered species within the foreseeable future throughout all or a significant portion of its range," *Id.* § 1532(20).

Once a species is listed, it becomes subject to certain protections under the ESA, including the consultation process that is outlined in Section 7(a)(2) and the ESA's implementing regulations. *See id.* § 1536; 50 C.F.R. §§ 402.01-.17. Section 7(a)(2) requires a Federal agency to ensure that a proposed action it intends to take "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02 (defining "action" as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas"). To comply with that mandate, the Federal agency (known as an "action agency") first determines whether its proposed action "may affect" listed species or critical habitat. *See* 50 C.F.R. § 401.14(a)-(b)(1). If the action agency determines that its proposed action will have "no effect" on listed species or critical habitat, the ESA's Section 7 consultation requirement is not triggered. *See id.*; *Nat'l Res. Def. Council v. U.S. Envt'l Prot. Agency*, Civil No. RDB 03-2444, 2005 U.S. Dist. LEXIS 45449, at *14-15 (D. Md. May 24, 2005).

However, if the action agency determines that its proposed action "may affect" listed species or critical habitat, then it must consult with the appropriate expert "consulting agency" (either NMFS or FWS, or both, depending on the species involved) to analyze the potential impacts of the proposed action on listed species and critical habitat. *See* 50 C.F.R. § 402.14(a)-(b)(1). The consultation can be "informal" or "formal" as appropriate. *See id.* § 402.13-402.14. Informal consultation is "an optional process that includes all discussions, correspondence, etc., between the [consulting agency and the action agency]. . . designed to assist the [action agency] in

determining whether formal consultation . . . is required." *Id.* § 402.13(a).  "If during informal consultation it is determined by the [action agency], with the written concurrence of [the consulting agency], that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary."  *Id.* § 402.13(c); *id.* § 402.14(b)(1).

If, however, the action agency or the consulting agency determines that the action is "likely to adversely affect" listed species or designated critical habitat, the agencies will then engage in formal consultation.  *Id.* § 402.14(a)-(b).  Formal consultation leads to the issuance of a written biological opinion by the consulting agency that assesses the likelihood of jeopardy to the species and destruction or adverse modification of its critical habitat.  50 C.F.R. § 402.14(g)-(h).  If a biological opinion concludes that the proposed action is not likely to jeopardize a listed species or adversely modify critical habitat, the action agency has completed its ESA requirements and may proceed with the proposed action if it chooses.  If, on the other hand, the biological opinion concludes that the proposed action is likely to jeopardize a listed species or destroy or adversely modify critical habitat, the consulting agency will suggest a reasonable and prudent alternative to the proposed action in the biological opinion.  16 U.S.C. § 1536(b)(3)(A); *see* 50 C.F.R. § 402.02. (defining "reasonable and prudent alternative").

During formal consultation, the action agency may elect to request that the consulting agency conduct a "programmatic consultation."[3]  50 C.F.R. § 402.14(c)(4).  However, it is ultimately the consulting agency's decision as to whether it will conduct a programmatic consultation.  *See id.* (stating that a request for a programmatic consultation is subject to the

---

[3] The regulations do not provide a similar option for conducting programmatic consultation during an informal consultation.  *See id.* at § 402.13.

approval of the "Director"); *id.* § 402.02 (defining "Director" as "the Assistant Administrator for Fisheries for the National Oceanic and Atmospheric Administration, or his authorized representative; or the Fish and Wildlife Service regional director, or his authorized representative, for the region where the action would be carried out."). A programmatic consultation is "a consultation addressing an agency's multiple actions on a program, region, or other basis." *Id.* § 402.02. Programmatic consultations allow the consulting agencies "to consult on the effects of programmatic actions such as: (1) [m]ultiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and (2) [a] proposed program, plan, policy, or regulation providing a framework for future proposed actions." *Id.*

The ESA contains a citizen suit provision that allows any person to commence a civil suit "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision" of the ESA or regulation issued pursuant to the ESA. 16 U.S.C. § 1540(g)(1)(A). Under the ESA, it is a mandatory requirement that a person must provide "written notice of the violation . . . to any alleged violator" at least sixty days before commencing a lawsuit. *Id.* § 1540(g)(2)(A)(i).

## III.    The APA

The ESA does not contain a provision specifying the standard of review that a Court should use when adjudicating ESA claims. Therefore, claims under the ESA citizen suit provision are reviewed pursuant to the Administrative Procedure Act ("APA"). *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 270 (4th Cir. 2018). The APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "Agency action" subject to review under the APA "includes the whole or a part of an agency rule, order,

license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). To be reviewable, agency action also must constitute "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." *Id.*

Section 706 of the APA grants a court the power to hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706. In determining whether an agency action is arbitrary and capricious, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

## STATEMENT OF UNDISPUTED FACTS

## I.     The AMHP Grant Proposal and Grant Agreement Process

There is a multistep process that occurs before a grant proposal can receive funding. For designated marine highway projects (such as the James River Project), MARAD first publishes a notice of funding opportunity in the Federal Register. 46 C.F.R. § 393.6(b). Applicants may then submit a grant proposal application requesting funds for specific projects to implement the designated marine highway project. *Id.* § 393.6(c); *see generally* MARAD 016258-67 (example of a grant application relating to the James River Project). The grant proposal applications that have been submitted are then reviewed by DOT and MARAD. During the agency review process, the grant application can be rejected or modified.

If the grant proposal is approved during the agency review process, the Secretary selects the grant proposal for an "award." *See* 46 C.F.R. § 393.6(a)(2) (stating that MARAD makes funding recommendations to the Secretary, who has the authority to award grants). However, the Secretary's "award" is not the culmination of the grant process. Once a grant is awarded, MARAD reviews the proposal pursuant to the ESA, the National Environmental Policy Act ("NEPA"), and other applicable laws and regulations. *See generally* MARAD 016625-26 (example of a NEPA categorical exclusion for a grant application relating to the James River Project). During this process, the grant application may still be rejected or modified. Once it is determined that the grant proposal complies with applicable laws and regulations, MARAD and the grant applicant may execute a grant agreement, which is similar to a contract. *See generally* MARAD 016268-90 (example grant agreement for a grant application relating to the James River Project). It is at this point that the grant proposal can be funded, in accordance with the terms and conditions of the grant agreement, and the grant applicant can proceed with the action in the grant proposal. *See id.*; MARAD 016291-93 (example invoice and request for reimbursement for the action in a grant proposal); MARAD 016294 (example wire transfer from MARAD to fund the action in the grant proposal).

## II.     The M-64 and Associated Marine Highway Projects

In 2010, the Secretary designated a marine highway route in Virginia known as M-64. MARAD 016259. The M-64 spans from Norfolk to Richmond, and includes the Chesapeake Bay, the James River, Hampton Roads, and connecting commercial navigation channels, ports, and harbors. Supplemental AR MARAD 016749. After the M-64 was designated as marine highway route, the James River Project was designated to service M-64. MARAD 016259. Since 2010, several grant proposals for the James River Project have been "awarded" by the Secretary and

funded through the grant proposal process.  Supplemental AR MARAD 016811-815.  In 2018, the

Virginia Port Authority submitted a grant proposal application to expand the existing barge service

on the M-64 by purchasing a new barge.  MARAD 016258-67.  The grant proposal was awarded

by the Secretary and a grant agreement was executed for $1,822,093.  MARAD 016268-90.

The funds for the 2018 grant proposal have been disbursed and expended.[4]  MARAD 016291-93

(invoice and request for reimbursement); MARAD 016294 (wire transfer from MARAD funding

the grant proposal).

### III.    Plaintiff's Notice of Intent to Sue

Plaintiff sent MARAD and the DOT a notice of intent to sue in July 2021.  *See* MARAD

016706-17.  The notice of intent to sue alleged two different legal violations.  First, Plaintiff

alleged that MARAD had failed to initiate and complete ESA Section 7 consultation on the AMHP

even though "there can be no doubt that the [AMHP] may affect, and is likely to adversely affect

listed species."  MARAD01671 (internal quotations omitted).  Plaintiff further claimed that

MARAD is required to conduct a programmatic consultation for the AMHP because project-

specific consultations, "while still required, are insufficient to ensure that the AMHP 'as a whole'

will not jeopardize species."  MARAD016716.  Second, Plaintiff alleged that "several grants that

MARAD has awarded (or is currently considering) . . . are likely to adversely affect listed species,

yet the agency has failed to undertake the required ESA Section 7 consultation."  MARAD016717.

The notice of intent to sue specifically identified the 2018 grant proposal for the James River

Project as something that required ESA consultation (MARAD016711), but did not reference grant

---

[4] In 2021, MARAD received a new grant proposal to improve the lighting at the Richmond Marine
Terminal. Although this grant proposal was awarded by the Secretary, a grant agreement has not
been executed. MARAD is still in the process of determining whether the grant proposal complies
with applicable laws and regulations. Because this is not a final agency action, Defendants did not
include any documentation for this proposal in their administrative record.

proposals that were awarded, or grant agreements that were executed, for the James River Project in 2010, 2016, 2017, or 2019.  *See generally* MARAD 016706-17.  Nor did the notice of intent to sue specifically mention the grant application that was submitted in 2021 and is currently being evaluated by MARAD.  *See generally id.* (mentioning only that Plaintiff is "aware of several grants that MARAD . . . is currently considering . . . that are likely to adversely affect listed species" but that MARAD has not conducted ESA Section 7 consultation on).

**STATEMENT OF DISPUTED FACTS**

Defendants dispute the following statements in Plaintiff's Statement of Undisputed Facts:

1.     "Escalating vessel traffic intensifies the risk of harm to imperiled species that rely on affected waterways by increasing the risk of ship strikes (i.e., collisions), entrainment (i.e., passage of fish through a ship's water intake), strandings (i.e., vessel wake causing fish to be washed ashore), and spills of contaminants such as oil and gas."  Plaintiff's Brief, ECF 28 at 11. This statement is not supported by the administrative record and Plaintiff does not provide a cite to the administrative record for this statement.

2.     "Several Marine Highway Projects that have received grants through the Program—in addition to the James River Project discussed below—demonstrate the risks that the Program poses to listed species."  *Id.* at 12.  This statement is not supported by the administrative record and Plaintiff does not provide a cite to the administrative record for this statement.

3.     "These species are known to be adversely affected by wake stranding from large vessel traffic." *Id.*  This statement is not supported by the administrative record and Plaintiff provides no cite to the administrative record.  Moreover, "adversely affected" is a legal term with specific meaning under the ESA, making this statement a legal conclusion rather than a fact.

11

4. "These sturgeon are known to be highly susceptible to ship strikes, which can adversely affect their recovery and continued existence." *Id.* at 13. This statement is not supported by the administrative record. Moreover, "adversely affected" is a legal term with specific meaning under the ESA, making this statement a legal conclusion rather than a fact.

5. "Barges pose a significant threat to pallid sturgeon in the Mississippi River." *Id.* at 14. This statement is not supported by the administrative record and Plaintiff does not provide a cite to the administrative record for this statement.

6. "The increase in vessel traffic attributable to the MARAD grant also increases the potential for contaminants to be introduced into the Ohio River, including heavy metals and fuel/oil that can harm listed mussels." *Id.* at 16. This statement is not supported by the administrative record and Plaintiff does not provide a cite to the administrative record for this statement.

7. "Although MARAD has never consulted under Section 7 of the ESA on the Program or these projects." *Id.* at 16. This statement is not legally accurate because MARAD is not required to consult under the ESA if there is no affirmative agency action and that action does not effect listed species.

8. "And while MARAD never consulted with the Services as required by the ESA." *Id.* This statement is not legally accurate because MARAD is not required to consult under the ESA if there is no affirmative agency action and that action does not effect listed species.

9. "These endangered fish are highly susceptible to ship strikes, particularly in the James River." Plaintiff does not provide a cite to the administrative record for this statement.

10. Plaintiff also includes several statements that rely on documents that are not included in the administrative record. *See id.* at 12-16. These sentences can be found immediately preceding footnotes 8-19, 12-17, 20, and 22-24. *See id.* There is also an additional reference to

one of these documents in the following sentence: "As set forth above, NMFS has determined that one of the threats to the recovery of the endangered pallid sturgeon is ship strikes and entrainment from such vessels." *Id.* at 15.

The APA specifies that the scope of review is limited to the "whole record or those parts of it cited by a party." 5 U.S.C. § 706.   The Court issued a scheduling order in this case requiring the parties to meet and confer to attempt to resolve any disputes concerning the completeness of the administrative record, the applicability of any exceptions to record review, or any asserted need for judicial review of extra-record materials.   Rule 16(b) Scheduling Order, ECF 21 at 3.   During this meet and confer process, Defendants agreed to supplement the administrative record with additional material.   Defendants did not agree to supplement the record with the documents that Plaintiff is citing to in the above-referenced footnotes.   However, Defendants agreed that they would not object to a motion for the Court to take judicial notice of these documents provided the documents are used as background material and not to support argument.   To the extent that these documents are being used for argument (i.e., to suggest that MARAD is required to conduct ESA Section 7 consultation because the grant proposals may affect listed species), Plaintiff should not be permitted to cite to or rely on them in this brief..

## ARGUMENT

## I.   MARAD is Not Required to Conduct an ESA Consultation for the AMHP

Plaintiff argues that MARAD must conduct an ESA Section 7 consultation on the entire AMHP because the ESA's implementing regulations define "action" to include a "program" and there is "no doubt" that the AMHP as a whole is a program that may affect listed species. Plaintiff's Brief, ECF 28 at 19-20.   But Plaintiff's argument represents a fundamental misunderstanding of both the AMHP and the ESA.

ESA consultation is triggered only by an affirmative agency action that may affect listed species or designated critical habitat.  *See Ctr. for Biological Diversity v. U.S. Envt'l Prot. Agency*, 847 F.3d 1075, 1090–91 (9th Cir. 2017) ("Section 7 consultation still must be triggered by an affirmative agency action"); *Cal. Sportfishing Prot. All. v. FERC*, 472 F.3d 593, 595 (9th Cir. 2006) (The ESA and its implementing regulations "mandate consultation . . . only before an agency takes some affirmative agency action.").  Therefore, presenting a cognizable claim that an agency has violated ESA Section 7 necessarily entails proving: (1) that an agency undertook a discrete, affirmative agency action; and (2) that the action was improper because it was taken without the agency having first completed ESA Section 7 consultation.

Here, Plaintiff has not identified a discrete, affirmative agency action taken by MARAD at a program-level that may affect listed species.  The establishment of the AMHP itself is not a discrete, affirmative agency action and it did not have any on the ground effects to ESA-listed species or otherwise.  Indeed, at the time the AMHP was created in 2010 it was not known what waterways the Secretary would designate as marine highway routes, what marine highway projects would be designated to supports those routes, or what species or critical habitats may have resided within those yet-to-be designated routes and would potentially be affected by any future grant proposals.

*Center for Biological Diversity v. U.S. Department of the Interior*, 563 F.3d 466 (D.C. Cir. 2009), provides an appropriate comparison in this situation.  In *Center for Biological Diversity*, Plaintiff challenged the Department of the Interior's approval of an Alaskan offshore oil and gas leasing program.  *Id.* at 472.  The Department of the Interior determined that ESA consultation was not required in adopting the program, as compliance with Section 7 would be completed during consideration of each lease agreement.  *Id.* at 482.  But Plaintiff alleged that the Department

of the Interior should have conducted ESA consultation during the preliminary approval of the program, arguing that the program as a whole "may affect" listed species. *Id.* The D.C. Circuit Court of Appeals held that "[g]iven the multi-stage nature of leasing programs under [the Outer Continental Shelf Lands Act], we must consider any environmental effects of a leasing program on a stage-by-stage basis, and correspondingly evaluate ESA's obligations with respect to each particular stage of the program." *Id.* at 483. Because no listed species could be impacted until the leasing stage of the program, it was not certain that any species would be impacted. *Id.* Thus, the Court found Plaintiffs' ESA challenge was not ripe. *Id.*

The principle animating the D.C. Circuit's decision applies with equal force in this case. The Court must distinguish between the creation of the AMHP, which had no on the ground effects to ESA-listed species, and the implementation of the AMHP through the execution of individual grant agreements. As in *Center for Biological Diversity*, the ESA consultation process should only apply at the implementation phase of the AMHP (i.e., the execution of grant agreements relating to grant proposals) because the mere establishment of the AMHP "does not cause any harm to anything because it does not require any action or infringe on the welfare of animals." *Id.* at 483.

Because Plaintiff has not identified an affirmative agency action that may affect listed species, ESA Section 7 consultation on the AMHP as a whole was never required. [5]

## II.    MARAD is Not Required to Conduct a Programmatic ESA Consultation on the AMHP

Even assuming that Plaintiff the AMHP is an affirmative agency action that may affect listed species, regulations promulgated by the consulting agencies NMFS and FWS *allow* agencies

---

[5] The AMHP was established more than a decade ago, and any challenge to its implementing regulations would be well past the statute of limitations. 28 U.S.C. § 2401(a). Plaintiff's attempt to shoehorn a challenge to individual grant applications into a generalized challenge to the AMHP to avoid the statute of limitations should be rejected.

to consult on programmatic actions such as the creation of the AMHP, *but do not require it.  See* 50 C.F.R. § 402.14(c)(4) ("Any request for formal consultation *may* encompass . . . a programmatic consultation.") (emphasis added).[6]  Courts have  held that where no programmatic framework plan or standards have been adopted, agencies have substantial discretion to determine how to comply with ESA Section 7, and may do so through individual, project or site-specific consultations.  *See e.g.*, *Ctr. for Biological Diversity v. Jackson*, 2012 U.S. Dist. LEXIS 126138 at *9 (N.D. Cal. 2012) ("Consultation need only be required once, not twice. The [implementation] stage is the best point to conduct consultation because it can be directed at the specific geographic waters involved and tailored to benefit the species and habitats affected within those waters."); *Nat'l Res. Def. Council v. U.S. Department of Navy*, No. CV-01-07781 CAS (RZX), 2002 WL 32095131, at *24 (C.D. Cal. Sept. 17, 2002) ("In the absence of a programmatic planning document such as the ones challenged in *Pacific Rivers* and *Lane County*, it appears that an agency has substantial discretion to determine whether a 'program' . . . or its component elements are the more appropriate object of ESA consultation.").  There is no programmatic planning document for the AMHP. Therefore, despite Plaintiff's arguments to the contrary, the ESA does not require MARAD to conduct a programmatic consultation on the AMHP.

### III.    Plaintiff's Arguments Regarding the James River Project also Fail

#### A.    MARAD's Designation of the James River Project is not Judicially Reviewable and Did Not Require ESA Consultation

To the extent Plaintiff is alleging that MARAD was required to consult under ESA Section 7 before designating the James River Project as a marine highway project, that argument fails for three different reasons.  First, Plaintiff did not raise that claim in their notice of intent to sue.  *See*

---

[6] Indeed, an action agency's request for a programmatic consultation cannot be legally required as it is subject to the approval of the consulting agencies.  *See id.*

*generally* MARAD 016706-17.  While Plaintiff's notice of intent to sue alleged (incorrectly) that the James River Project may affect listed species and that Defendants have not completed Section 7 consultation prior to executing the 2018 grant agreement, it does not allege that the Secretary's designation of the James River Project as a marine highway project is itself unlawful.  *See generally id.*  As discussed above, Plaintiff is required to include the claims it intends to raise in its complaint in its notice of intent to sue.  16 U.S.C. § 1540(g)(2)(A)(i).  For this reason, this claim is not justiciable.  *Conservation Force v. Salazar*, 715 F. Supp. 2d 99, 103-04 (D.D.C. 2010).

Second, even if the Court could adjudicate this claim, the designation of the James River Project is not a "final agency action" subject to judicial review under the APA.  *See* 5 U.S.C. § 704.  An "agency action" as defined by the APA "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent thereof, or failure to act." *Id.* § 551(13).  "[T]he APA's definition of agency action focuses on an agency's determination of rights and obligations, whether by, rule, order, license, sanction, relief, or similar action." *Village of Bald Head Island v. United States Army Corps of Engineers*, 714 F.3d 186, 193 (4th Cir. 2013) (emphasis in original).  The designation of any marine highway project, including the James River Project, does not determine any rights or obligations.  Rather, the designation of a marine highway project is just the start of a process that may, or may not, lead to specific grant proposals being approved and funded.  The execution of the grant is the point at which rights and obligations are determined for purposes of the APA.  Until that time, there is no final agency action that is judicially reviewable.  Therefore, the Court cannot adjudicate this claim.

Third, for a similar reason, the designation of the James River Project does not require ESA Section 7 consultation.  Just like the designation of a marine highway project is not a final agency action as defined by the APA, it is not an agency action as defined by the ESA's implementing

regulations.  *See* 50 C.F.R. § 402.02 (defining "action" as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas").  It is not an "activity" or even a "program."  *See id.*  Rather, the designation of a marine highway project is just the start of a process that may, or may not, lead to specific projects being approved and funded.  Therefore, MARAD was not required to conduct ESA Section 7 consultation on the designation of the James River Project at the time the project was designated, so this argument fails on its merits.

>   **B.      Plaintiff's Claim Regarding the Grant Proposals for the James River Expansion Project is Not Redressable**

Because the Court is not able to adjudicate a claim that the Secretary's designation of the James River Project itself violates the ESA, Defendants are assuming that Plaintiff intends to challenge an event that is both a final agency action under the APA and an agency action under the ESA: the execution of grant agreements.  However, this argument fares no better than Plaintiff's prior arguments.  MARAD must comply with Section 7 of the ESA—as must all other Federal agencies that wish to undertake a proposed action.  *See* 16 U.S.C. § 1536(a)(2).  And Defendants do not dispute that the execution of a grant agreement is an "action" as defined by the ESA.  50 C.F.R. § 402.02.  But Plaintiff has failed to, and cannot, establish that this Court can redress previously finalized and funded grant agreements that have already been executed. Therefore, Plaintiff lacks standing to bring this claim.

To establish Article III standing, Plaintiff must prove three elements: (1) an injury in fact that is both concrete and particularized and actual or imminent; (2) a causal connection between the injury and Defendants' conduct; and (3) a likelihood that the injury will be redressed by a favorable decision.  *Lujan*, 504 U.S. at 560-61.  An injury is redressable if it is likely, and not merely speculative, that the plaintiff "personally would benefit in a tangible way from the court's

intervention." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018) (citation omitted). Here, Plaintiff's claim is not redressable. Even if the Court were to award Plaintiff the exact relief it requested in its complaint regarding the James River Project—declaratory relief that the AMHP violates the ESA and an order for Defendants to initiate ESA Section 7 consultation—Plaintiff would not "benefit in a tangible way" from the Court's order. *See id.*; Complaint, ECF 1 at 24.

MARAD has already disbursed funding for the 2018 grant that was executed for the James River Project. MARAD 016291-93 (invoice and request for reimbursement); MARAD 016294 (wire transfer from MARAD funding the grant proposal). Therefore, even if MARAD were to conduct an ESA consultation at this point (which is not necessary because the projects did not affect listed species as discussed below) and the consulting agency somehow determined that the projects funded by the grants were likely to jeopardize listed species or adversely modify critical habitat, MARAD could not require the awardees to make any changes for the benefit of the listed species. In other words, the ESA consultation would be pointless.[7] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."). Thus, Plaintiff's claim is not redressable and Plaintiff lacks standing to adjudicate this claim.[8]

---

[7] Nor could the Court order MARAD to conduct ESA consultation when it executes any potential future grants. Given the rigorous grant review process and the fact that executing any grant depends on funding availability, it is uncertain whether grants will be issued for the James River Project in the future. Any speculative future grants are not ripe for judicial review, do not constitute a final agency action under the APA, and are not "agency action" as defined by the ESA.

[8] Plaintiff's claim is also moot. *See Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 162 (4th Cir. 2021) ("A pending lawsuit is rendered moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.") (internal quotations omitted). Because the funding has been disbursed, the issue of whether MARAD complied with the ESA when analyzing the grant proposal is no longer live.

### C.      MARAD is Not in Continuing Violation of the ESA

Even if the Court finds that Plaintiff's claim is redressable and Plaintiff has Article III standing, MARAD is not "in violation" of the ESA. *See* 16 U.S.C. § 1540(g)(1)(a). As Plaintiff concedes, it has brought this case "pursuant to the ESA's citizen suit provision, which allows the Court to enjoin a federal agency that is *in violation* of the Act." Plaintiff's Brief, ECF 28 at 18 (emphasis added); *see* 16 U.S.C. § 1540(g)(1)(a). The Supreme Court has held that a citizen suit may not be premised solely on past violations due to Congress's use of the words "in violation." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 57 (1987).[9] The Fourth Circuit has elaborated that, in order to establish jurisdiction, a plaintiff must prove that "an ongoing violation" had been occurring at the time the complaint was filed. *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 412 F.3d 536, 539 (4th Cir. 2005). Plaintiff can establish an ongoing violation in one of two ways: (1) proving violations that continue on or after the date the complaint is filed or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. *Id.* (quoting *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171-72 (4th Cir. 1988)).

In its brief, Plaintiff alleged that MARAD did not conduct ESA consultation on grant proposals for the James River Project from 2017, 2018, 2019, and 2021. *See* Plaintiff's Brief, ECF 28 at 25. However, Plaintiff did not provide adequate notice that it intended to challenge the grant proposals from 2017 or 2019. *See generally* MARAD 016706-17. Nor did the notice of intent to sue specifically mention the grant application that was submitted in 2021 and is currently being evaluated by MARAD. *See generally id.* (mentioning only that Plaintiff is "aware of several grants

---

[9] The Supreme Court in *Gwaltney* analyzed the citizen suit provision of the Clean Water Act, which is nearly identical to the citizen suit provision in the ESA.

that MARAD . . . is currently considering . . . that are likely to adversely affect listed species" but that MARAD has not conducted ESA Section 7 consultation on).  Because Plaintiff is required  to provide adequate notice under the ESA to bring a claim, any claim regarding these grant agreements are not justiciable.[10]  In addition, Plaintiff did not challenge the 2017 or 2019 grant proposals in their complaint.  *See generally* Complaint, ECF 1.

As discussed previously, MARAD has already distributed funding for the 2018 grant proposal and conducting ESA Section 7 consultation now would have no effect on listed species. MARAD 016291-93 (invoice and request for reimbursement); MARAD 016294 (wire transfer from MARAD funding the grant proposal).  Moreover, Plaintiff has not passed the test established by the Fourth Circuit in *Chesapeake Bay Foundation*, 844 F.2d at 171-72.  Plaintiff has not presented any proof that MARAD is currently violating the ESA regarding the James River Project, or has violated the ESA regarding the Project since October 2021 when Plaintiff filed its complaint.  *See id.*  Nor has Plaintiff produced evidence demonstrating a continuing likelihood that, not only will MARAD continue to execute grant agreements for the James River Project (which is dependent on the availability of funding, a project sponsor proposing a grant application, the grant application surviving the grant review process, the Secretary "awarding" the grant proposal, the grant proposal complying with the ESA and other applicable laws and regulations, and a grant agreement being executed), but that MARAD will not comply with the ESA.  MARAD does not need to conduct either formal or informal Section 7 consultation in order to comply with the ESA. It simply needs to determine that the proposed action (execution of the grants) will have

---

[10] Moreover, the funding for the grant proposals issued in 2017 and 2019 have already been disbursed.  Therefore, any arguments regarding these grant proposals are moot and not redressable. As for the 2021 grant proposal, MARAD is still in the process of determining whether it complies with all applicable laws and regulations.  Thus, the grant has not been executed and no agency action has occurred.

no effect on listed species, which the agency did in 2018.  MARAD 016625-26.[11]  For these

reasons, Plaintiff cannot establish that MARAD is "in violation of the ESA" and thus their claims

in this particular ESA citizen suit against MARAD challenging these particular grants associated

with the James River Project must fail.

**CONCLUSION**

In sum, Plaintiff has not established that MARAD was legally required to conduct a

programmatic consultation on the AMHP as a whole.  Likewise, Plaintiff has failed to demonstrate

that MARAD was legally required to conduct Section 7 consultation on the designation of the

James River Project.  Finally, with respect to Plaintiff's claims about specific grants issued under

the James River Project, such claims are not justiciable because there is no relief under the APA

or ESA that the Court could issue that would redress Plaintiff's grievances with those particular

previously issued grants.  Therefore, the Court should grant Defendants' motion for summary

judgment and deny Plaintiff's motion for summary judgment.

*[Signature page follows.]*

---

[11] A categorical exclusion is an agency decision made under NEPA that a proposed action does not individually or cumulatively have a significant effect on the human environment.  *See* 40 C.F.R. § 1508.1(d).  MARAD can only decide that there is a categorical exclusion if the proposed action has "no effect" on listed species under the ESA.  MARAD 016718-19; 016725; Supplemental AR MARAD 016725.

Dated: April 25, 2022

Respectfully submitted,

PETE BUTTIGIEG,
Secretary of Transportation,

LUCINDA LESSLEY,
Acting Administrator of Maritime Administration,

MARITIME ADMINISTRATION,

JESSICA D. ABER,
United States Attorney

*/s/*_____
Garry D. Hartlieb, IL Bar No. 6322571
Assistant United States Attorney
Office of the United States Attorney
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Telephone: (757) 441-6331
Facsimile:  (757) 441-6689
E-mail: garry.hartlieb@usdoj.gov

TODD KIM,
Assistant Attorney General

SETH M. BARSKY,
Section Chief

MEREDITH L. FLAX,
Assistant Section Chief
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section

*/s/*_____
Kaitlyn Ashley Poirier, TN Bar No. 034394
(*admitted pro hac vice*)
Wildlife & Marine Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, D.C. 20044
Telephone: (202) 598-1050
Facsimile:  (202) 305-0275
E-mail:  kaitlyn.poirier@usdoj.gov
*Counsel for Defendants*