**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Newport News Division

CENTER FOR BIOLOGICAL DIVERSITY,

      Plaintiff,

           v.                              Civil No. 4:21-cv-00132

UNITED STATES MARITIME
ADMINISTRATION, PETE BUTTIGIEG, in
his official capacity, and ANN C. PHILLIPS,
in her official capacity,

      Defendants.

## <u>MEMORANDUM OPINION</u>

In this dispute, the Center for Biological Diversity ("Plaintiff" or the "Center") brings a citizen suit against the United States Department of Transportation Maritime Administration ("MARAD"); the Secretary of Transportation, Pete Buttigieg; and the Administrator of MARAD, Ann Phillips[1] (together, "Defendants") for failure to engage in Endangered Species Act ("ESA") Section 7 consultation on the U.S. Marine Highway Program in its entirety ("Marine Highway Program" or "Program") and grants issued under the Program's James River Container Expansion Project ("James River Project"). Compl. ¶¶ 76–82. Plaintiff requests that the Court declare the Marine Highway Program in violation of the ESA and order Defendants to consult on the Program and the James River Project grants. *Id*. at 24. Pending before the Court are cross-motions for summary judgment filed by Plaintiff and Defendants. *See* ECF Nos. 27, 31.

---

[1]     The lawsuit was originally brought against Lucinda Lessley, the then-current Administrator for the Department of Transportation Maritime Administration. Following Ms. Phillips' appointment to the position, she was substituted as a party under Fed. R. Civ. P. 25(d). *See* Order at 1 n.1, ECF No. 45.

For the reasons set forth below, both motions will be granted in part and denied in part. The Court finds MARAD in violation of the ESA for failure to conduct a Section 7 consultation on its issuance of the Fiscal Year ("FY") 2018 James River Project grant. *See* MARAD 016268–94.[2] The Court will order MARAD to engage in Section 7 consultation on the FY 2018 grant to determine whether it is "likely to jeopardize the continued existence" of Atlantic sturgeon populations in the James River. 16 U.S.C. § 1536(a)(2). The parties will be directed to meet and confer and submit to the Court a proposed schedule for consultation by April 14, 2023.

## I.     BACKGROUND

### A.     Marine Highway Program

Congress created the Marine Highway Program through the Energy Independence and Security Act of 2007 in an effort to "relieve landside congestion along coastal corridors." Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492, 1760 (2007) (codified as amended at 46 U.S.C. § 55601). The Program authorizes the Department of Transportation to provide grants to projects proposed by various entities ("Marine Highway Projects") if such a project "develops, expands, or promotes" "marine highway transportation" or "shipper use of marine highway transportation." 46 U.S.C. § 55601(d)(1)(B).[3] These projects are "planned or contemplated new services, or expansions of existing services . . . that seek to provide

---

[2]     The administrative record in this case was submitted to the Court on March 1, 2022, ECF No. 24, with a supplement submitted on March 15, 2022, ECF No. 26. Citations to MARAD 000001–16719 refer to the record that was initially submitted. Citations to MARAD 016720–16815 refer to the supplement.

[3]     Recent changes to the Marine Highway Program enacted during the pendency of this litigation have removed requirements for separate Marine Highway Project designations that were required at the time this lawsuit was commenced. *Compare id.* § 55601(d)(2)(C), *with* 46 U.S.C. § 55601(d) (2021); *see also* James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 ("FY 2023 NDAA"), Pub. L. No. 117-263, 136 Stat. 2395–3080 (2022); Defs.' Notice of Suppl. Authority, ECF No. 51.

new modal choices to shippers, reduce transportation costs, and/or provide public benefits, which include reduced air emissions, reduced road maintenance costs, and improved safety and resiliency impacts." 46 C.F.R. § 393.1(f). In order to qualify for funding, a project must serve a designated Marine Highway Route. 46 U.S.C. § 55601(d)(2)(A)(i)(I). These routes are designated by the agency on "commercially navigable coastal, inland, and intracoastal waters of the United States," and meant to serve as "a component of the Nation's surface transportation system." 46 C.F.R. § 393.1(e). A route may be designated if it "provides a coordinated and capable alternative to landside transportation," "mitigates or relieves landside congestion," "promotes marine highway transportation," or uses certain vessels. 46 U.S.C. § 55601(b)(1)(A).

The Marine Highway Program began in 2010 when MARAD issued a final rule implementing the Program. 75 Fed. Reg. 18095 (Apr. 9, 2010) (codified as amended at 46 C.F.R. pt. 393). The rule set forth criteria and eligibility requirements for the designation of Marine Highway Routes and Marine Highway Projects. 46 C.F.R. §§ 393.2–393.3.

On August 11, 2010, MARAD designated an initial 18 Marine Highway Routes, including M-64, which spans from Norfolk to Richmond, and consists of the Chesapeake Bay, the James River, Hampton Roads, and connecting commercial navigation channels, ports, and harbors. MARAD 000075–76; MARAD 016749. MARAD designated the James River Project along the M-64 route to "[e]xpand existing container-on-barge service and initiate a container shuttle service between four terminals in the Hampton Roads area." MARAD 000076; MARAD 016781. MARAD awarded grants under the James River Project in FY 2010, FY 2016, FY 2017, FY 2018, and FY 2019.[4] MARAD 016812–13. The FY 2018 grant was for $1,822,093 to "construct[] . . . a

---

[4]     Since this lawsuit was filed, MARAD also awarded grants under the James River Project for FY 2021 and FY 2022. *U.S. Marine Highway Program – Grant Awards*, U.S. Dep't of Transp. Mar. Admin., https://cms.marad.dot.gov/grants-finances/marine-highways/us-marine-highway-program-grant-awards (last updated Feb. 12, 2023).

third barge to expand existing service in order to accommodate an estimated 27% annual growth" on the M-64 route. MARAD 016626; MARAD 016813. The barge was estimated to "increas[e] the number of weekly trips to seven days," "carrying an average of 170 containers per trip." MARAD 016626.

### B.    Endangered Species Act

The James River is home to Atlantic sturgeon, a fish species listed as endangered under the Endangered Species Act. 16 U.S.C. § 1533; *see* 50 C.F.R. § 224.101(h) (listing the Chesapeake Bay distinct population segment of Atlantic sturgeon as endangered); 50 C.F.R. § 226.225(f)(4) (designating the James River as critical habitat for this sturgeon population). Atlantic sturgeon have a maximum lifespan of sixty years, can grow up to fourteen feet long, and weigh as much as 800 pounds. *See* 82 Fed. Reg. 39160, 39162 (Aug. 17, 2017) (codified at 50 C.F.R. pt. 226). The National Marine Fisheries Service has indicated that "vessel strikes" contribute to their endangered status. *Id*. at 39216. Likewise, a 2007 report issued by the National Marine Fisheries Service found that with "the increase in boating traffic, the potential for sturgeon to be struck by boats is greater, and this seems to happen commonly." Atlantic Sturgeon Status Review Team, Status Review of Atlantic Sturgeon (*Acipenser oxyrinchus oxyrinchus*), Report to National Marine Fisheries Service, Northeast Regional Office, at 91 (2007) ("Atlantic Sturgeon Status Review"). The report also indicated that "[l]ocations that support large ports and have relatively narrow waterways," such as the James River, "seem to be more prone to ship strikes." *Id.*; *see also* Matthew T. Balazik, et al., *The Potential for Vessel Interactions with Adult Atlantic Sturgeon in the James River, Virginia*, 32 N. Am. J. Fisheries Mgmt. 1062, 1062–68 (2012) (explaining the results of 2012 study assessing the likelihood of vessels along the James River striking Atlantic sturgeon).[5]

---

[5]    Defendants contend that Plaintiff is unable to rely on these documents because they were "not included in the administrative record." Defs.' Mem. at 11–13. Specifically, Defendants argue

The Endangered Species Act was enacted to "protect and conserve endangered and threatened species and their habitats." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 651 (2007). Under the Act, Congress directed the Secretaries of Commerce and Interior to list endangered and threatened species and designate listed species' critical habitats. 16 U.S.C. § 1533(a)(1). A key procedural protection included in the Act is Section 7's consultation requirement:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical . . . .

16 U.S.C. § 1536(a)(2).

ESA's implementing regulations promulgated by the United States Fish and Wildlife Service and the National Marine Fisheries Service (together, the "Services") have set forth the following procedure for Section 7 consultation. An agency must first "review its actions at the earliest possible time" to determine if any actions "may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). Then, if the agency determines any of its actions may do so, it must engage in "formal consultation" with either the United States Fish and Wildlife Service or National Marine Fisheries Service, as appropriate, unless the agency, through a biological assessment or as a result

that the Administrative Procedure Act limits the scope of this Court's review to the "whole record or those parts of it cited by a party." *Id*. at 13 (quoting 5 U.S.C. § 706). This argument is unpersuasive. The documents Plaintiff relies on were all cited in its notice of intent to sue. *See* MARAD 016711. Therefore, this is not new evidence. Additionally, while not necessary to resolve here, the Court recognizes that some courts have looked outside the administrative record in failure to consult cases. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011) ("[W]e may consider evidence outside the administrative record for the limited purposes of reviewing Plaintiffs' ESA claim." (citation omitted)). Moreover, to the extent Defendants intend to dispute the underlying contentions of these scientific studies and expert opinions, they provide no conflicting evidence. Therefore, they have not created a genuine factual dispute.

of informal consultation with the Services, determines that the proposed action is not likely to adversely affect any listed species or critical habitat. *Id.* § 402.14(b)(1).[6] Formal consultation culminates in the issuance of a written biological opinion by the relevant consulting agency that assesses the likelihood of jeopardy to the species and destruction or adverse modification of its critical habitat. *Id.* § 402.14(g)–(h); *see also Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 264 (4th Cir. 2022). If the consulting agency determines that the agency action is likely to jeopardize a species, it must outline "reasonable and prudent alternatives" that it believes would avoid such jeopardy. 16 U.S.C. § 1536(b)(3)(A).

This consultation requirement applies to any agency "action," which is defined broadly in the implementing regulations to include "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas," with examples including, but not limited to, "actions intended to conserve listed species or their habitat," "the promulgation of regulations," "the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid," and "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02.

Additionally, formal consultation "may encompass, subject to the approval of the Director, a number of similar individual actions within a given geographical area, a programmatic consultation, or a segment of a comprehensive plan." 50 C.F.R. § 402.14(c)(4). A "programmatic consultation" is defined as "a consultation addressing an agency's multiple actions on a program, region, or other basis." 50 C.F.R. § 402.02.

---

[6]     If the agency makes this determination based on informal consultation, a written concurrence by the Director of the respective consulting agency is required. 50 C.F.R. § 402.14(b)(1).

### C.      Procedural History

On July 27, 2021, the Center sent a letter to MARAD providing notice of alleged violations of the ESA for failure to consult on the Marine Highway Program. MARAD 016706–17. Plaintiff alleged two separate challenges. First, Plaintiff argued MARAD violated the ESA due to its "failure to undertake programmatic ESA consultation." MARAD 016706. Plaintiff noted that programmatic consultation of the Marine Highway Program would allow MARAD to take "a holistic view of the program" and to "establish standards, guidelines, and governing criteria" before funding any specific project. MARAD 016707. Plaintiff additionally alleged a violation for failure to conduct a "project-specific consultation on projects funded by the agency under that program." MARAD 016706.

On October 12, 2021, Plaintiff filed the instant lawsuit in the Newport News Division of this Court. *See generally* Compl., ECF No. 1. Plaintiff raised its programmatic challenge to the Marine Highway Program and an individual challenge to the James River Project, listing a grant issued under the project in FY 2018 and another grant the project applied for in 2021. *Id.* ¶ 76. The parties then filed cross motions for summary judgment, supporting and opposing memoranda, and replies. Pl.'s Mot. Summ. J., ECF No. 27; Pl.'s Mem. Law Supp. Mot. Summ. J. ("Pl.'s Mem."), ECF No. 28; Defs.' Mot. Summ. J., ECF No. 31; Mem. Law Supp. Defs.' Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J. (Defs.' Mem."), ECF No. 32; Pl's Reply Supp. Mot. Summ. J. & Opp'n Defs.' Mot Summ. J. ("Pl.'s Reply"), ECF No. 33; Reply Supp. Defs.' Mot. Summ. J. ("Defs.' Reply"), ECF No. 34. Subsequently, Plaintiff filed two notices of supplemental authority, ECF No. 40, 46, to which Defendants responded, ECF No. 41, 47. Defendants also filed a notice of supplemental authority. ECF No. 51. On August 23, 2022, the case was transferred to the undersigned.

Finding the issues adequately presented, the matter is ripe for disposition.

## II.    STANDARD OF REVIEW

Plaintiff brings this action under the ESA's citizen suit provision, which authorizes a person to commence a civil suit "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision" of the ESA or regulation issued pursuant to the ESA. 16 U.S.C. § 1540(g)(1)(A).

As the ESA citizen suit provision does not provide an internal standard of review, Section 706 of the Administrative Procedure Act ("APA") applies to the Court's review of MARAD's actions. 5 U.S.C. § 706(2)(A); *see also W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011). Accordingly, the Court will hold unlawful agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

A court should grant summary judgment where the movant demonstrates that no genuine dispute exists "as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts have found summary judgment to be an appropriate method of resolving a challenge to a federal agency's actions when the review is based primarily on the administrative record. *See, e.g.*, *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

## III.    ANALYSIS

### A.    Jurisdiction

Before turning to the merits, the Court must first assure itself of its jurisdiction to hear the case. *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 187 (4th Cir. 2019) (citing *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)). In order for its case to be justiciable, Plaintiff is required to have standing and the claims must not have become moot. Likewise, under the EPA's citizen suit provision, Plaintiff must provide a sixty-day notice of an alleged violation prior to commencing litigation. 16 U.S.C. § 1540(g)(2)(A)(i). The Court will consider each issue in turn.

1.    Standing

The standing doctrine is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" of standing contains three elements: a concrete and particularized injury that is actual and imminent, a causal connection between the injury and the Defendants' conduct, and a likelihood that the Court would be able to redress the injury. *Id.* An organization has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The Center clearly establishes the second and third prongs of associational standing. As to the second prong, the Center describes itself as "a national nonprofit conservation organization that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction." Compl. ¶ 14. In this lawsuit, the Center indicates that it "advocates for the interests of its members who live, work, and recreate in places affected by MARAD's Marine Highway Projects and who use, study, and cherish the land, water, wildlife and other resources that will be irrevocably damaged by MARAD's activities." *Id.* ¶ 15. The interests Plaintiff seeks to protect are germane to its purpose.

As to the third prong, the Center's requested relief—a declaration that MARAD's Marine Highway Program is in violation of the ESA and applicable regulations; ordering Defendants to initiate Section 7 programmatic consultation on the Marine Highway Program as a whole; and ordering Defendants to initiate Section 7 consultation on James River Project grants—would not require the involvement of any individual member in the litigation. *Id.* at 24. Therefore, the Center

9

has associational standing as long as one of its members has standing to sue in his or her own right. The Court will turn to that analysis now, beginning with the "hard floor" of Article III jurisdiction—injury in fact. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).

      a.   *Injury in fact*

The injury Plaintiff asserts in this case is procedural. Specifically, Plaintiff contends that MARAD failed to engage in consultation under Section 7 of the ESA. In effect, Plaintiff is alleging that MARAD did not follow the necessary agency regulations to "insure" its actions related to the Marine Highway Program and grants under the James River Project were "not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). The failure to consult has been charactered by courts as an "archetypal procedural injury." *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)); *see also Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (citing *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003)).

The Supreme Court has recognized that a plaintiff "who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7; *see also Hodges v. Abraham*, 300 F.3d 432, 445 (4th Cir. 2002). However, "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Summers*, 555 U.S. at 497. "A procedural injury claim therefore must be tethered to some concrete interest adversely affected by the procedural deprivation." *WildEarth Guardians*, 738 F.3d at 305. The Supreme Court has recognized, "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562–63 (citing *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972)). However, members must assert more than just a "some day"

intention to observe the animal species. *Id.* at 564. They must describe "concrete plans" to observe the species in the future to support a finding that the injury is actual or imminent. *Id.*

Here, the procedural injury asserted by the Center is sufficiently tied to the interests of its individual members. Plaintiff submitted affidavits by Center members describing their interests in the Atlantic sturgeon. For example, Center member Ken Goldsmith indicated he received "academic, recreational, conservational, and aesthetic benefits from rare species' existence in the wild." Goldsmith Decl. ¶ 8, ECF No. 28-2. Goldsmith lives on Powhatan Creek, a small tributary of the James River in Virginia. *Id.* ¶ 3. He stated that during the appropriate seasons, and at multiple points along the Colonial National Historic Parkway, he and his family "actively watch for signs of Atlantic sturgeon." *Id.* ¶ 6.

Center member Catherine W. Kilduff also asserted an interest in Atlantic sturgeon. In particular, she described having the opportunity to "view Atlantic sturgeon during their fall spawning run in the James River." Kilduff Decl. ¶ 16, ECF No. 28-4. She explained that during this time sturgeon engage in an activity known as "breaching," where the fish "swim fast towards the surface of the river and fling [themselves] out of the water." *Id.* Given the size of these large fish, Kilduff noted, "their splashes are significant and exciting to observe." *Id.* She stated that she had specific plans to return the following fall to "observe and photograph" the sturgeon as they engaged in these behaviors. *Id.* ¶ 17. Both Goldsmith and Kilduff have sufficiently described their desire to observe the Atlantic sturgeon, including concrete future plans, and have therefore established a legally cognizable interest.

###### b. *Causation and redressability*

In addition to injury in fact, Plaintiff must also meet the relaxed standards for causation and redressability. As the Supreme Court has stated, "[w]hen a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the

injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). In other words, Plaintiff must establish both that its requested relief is causally connected to Plaintiff's individualized injury and that there is "some possibility" the Court granting such relief will redress that injury. *Id.*; *see also Ctr. for Biological Diversity*, 861 F.3d at 184; *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226–27 (9th Cir. 2008).

The Court finds that Plaintiff has standing to challenge MARAD's failure to consult on the FY 2018 James River Project grant[7] because causation and redressability are satisfied. For causation, Plaintiff must show that MARAD's FY 2018 grant issuance is causally connected to Plaintiff's interests in the James River Atlantic sturgeon. The grant was for $1,822,093 to the James River Barge Line and was "awarded for the acquisition of a third barge to expand the existing service on the M-64-route." MARAD 016813. The barge was intended to "accommodate an estimated 27% annual growth" on the route and estimated to "increas[e] the number of weekly trips to seven days," "carrying an average of 170 containers per trip." MARAD 016626. This increased traffic would necessarily flow through the James River, a protected habitat for endangered Atlantic sturgeon. *See* MARAD 016749 (explaining Marine Highway M-64 includes the James River and spans from Richmond, Virginia to Norfolk, Virginia); 50 C.F.R. § 226.225(f)(4) (defining endangered Atlantic sturgeon habitat as the entirety of the James River from the Bosher Dam west of Richmond to the mouth of the Chesapeake Bay); *see also* 82 Fed. Reg. at 39179–80 (explaining that "navigation channels" were not excluded from the critical habitat designation). Therefore, the issuance of the grant could impact the Atlantic sturgeon, given that the National Marine Fisheries Service has determined "vessel strikes" to these fish are "threats

---

[7]     As explained below, *infra* Section III.A.3, Plaintiff's grant-specific challenge is limited to the FY 2018 James River Project grant.

contributing" to their endangered status. *Id.* at 39216; *see also* Atlantic Sturgeon Status Review, *supra*, at 91; Balazik, et al., *supra*, at 1062–69.

Regarding redressability, Plaintiff must show there is "some possibility" that ordering MARAD to engage in Section 7 consultation on the FY 2018 James River Project grant would redress injury to the Plaintiff's interests in the Atlantic sturgeon. *Massachusetts*, 549 U.S. at 518. Defendants argue that Plaintiff cannot make this showing because the FY 2018 James River Project grant funds have already been distributed and "MARAD could not require the awardees to make any changes for the benefit of the listed species." Defs.' Mem. at 19. The Court disagrees.

It is possible that MARAD's consultation on the FY 2018 James River Project grant could lead the consulting agency to conclude that the barge purchased using the grant funds jeopardizes Atlantic sturgeon, given their susceptibility to vessel strikes. And despite Defendants' argument to the contrary, MARAD retains discretion to make changes to the grant. Section 8.3(b) of the FY 2018 grant agreement provides that "adjustment of funds under this Agreement follow the requirements of 2 C.F.R. 200.343–.345." MARAD 016275. These regulations allow for MARAD to "recover funds [from the grant awardee] on the basis of a later audit or other review," as long as notification is made to "the non-Federal entity within the record retention period." 2 C.F.R. § 200.345. The record retention period for this type of non-renewing federal grant is "three years from the date of submission of the final expenditure report." *Id.* § 200.334. In the case of the FY 2018 James River Project grant, the date of the invoice and request for reimbursement was February 10, 2020.[8] MARAD 016291–93. Therefore, since Plaintiff brought this lawsuit less than

---

[8] While no official "final expenditure report" is contained in the record, and it is possible that such a report could have been created at some point prior to February 10, 2020, this does not present an issue. This report could only have been produced after the grant agreement was executed by MARAD on January 21, 2020, which is less than three years prior to Plaintiff commencing its lawsuit. MARAD 016282–83.

three years later, on October 12, 2021, MARAD retained discretion to modify the award at the time the case was commenced.[9]

The Court also finds that Plaintiff has standing to challenge MARAD's failure to consult on the Marine Highway Program.[10]

2.    Mootness

In addition to standing, the Court must also consider whether during the pendency of this litigation the matter has become moot. "A pending lawsuit is rendered moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 162 (4th Cir. 2021) (internal quotations omitted); *see also U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 395–96 (1980).

---

[9]    For this reason, the Court also rejects Defendants' argument that MARAD is not "in violation" of the ESA because any violation that occurred was in the past. Defs.' Mem. at 20–22. The ESA's citizen suit provision provides that "any person may commence a civil suit on his own behalf . . . to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A). The Supreme Court has found "wholly past violations" insufficient to establish federal jurisdiction under a similarly worded citizen suit provision. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987). However, this case does not involve "wholly past violations" because at the time Plaintiff filed suit MARAD had a continuing obligation to comply with the ESA and retained discretion to modify the FY 2018 James River Project grant award.

[10]    Defendants do not contest Plaintiff's standing to make its programmatic challenge. The key distinction between the standing inquiry for Plaintiff's grant-specific argument and its program-level argument is the relevant agency action. As discussed *infra* Section III.B, Plaintiff improperly characterizes the Program as a singular agency action, when, in fact, Plaintiff's challenge incorporates multiple agency actions including "implementation," "designations, ongoing grants, and other mechanisms." Pl.'s Mem. at 19; Pl.'s Reply at 3. The Court finds that these actions provide a basis for standing. MARAD's promulgation of regulations implementing the Program and ongoing Marine Highway designations impact future grants under the Program. Therefore, consultation encompassing such actions could impact Plaintiff's cognizable interests in the Atlantic sturgeon.

Similar to their standing arguments, Defendants contend that grants issued under the James River Project are moot because "funding has been disbursed." Defs.' Mem. at 19 n.8.[11] As discussed, this argument lacks merit as to the FY 2018 James River Project grant because MARAD retains discretion to "recover funds" for three years after "submission of the final [grant] expenditure report." 2 C.F.R. §§ 200.334, .345. This three-year period is also suspended during litigation, which removes concern that the agency has lost discretion to "recover funds" under the grants during the pendency of the litigation. *See id.* § 200.334(a) ("If any litigation . . . is started before the expiration of the 3-year period, the records must be retained until all litigation . . . involving the records ha[s] been resolved and final action taken.").

However, even if the agency has, in fact, lost discretion to make changes under the grant awards, therefore mooting the challenge, this is also an issue "capable of repetition, yet evading review." *S. Pac. Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498, 515 (1911). This doctrine applies "only in exceptional situations, where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)) (cleaned up). Both prongs are satisfied here. The James River Project contracts that have been submitted to the Court—for FY 2017, 2018, and 2019—were drafted such that upon project execution, there were approximately six months before the "planned project closeout" date. *See* Defs.' Reply, Ex. 1, ECF No. 34-1 (FY 2017); MARAD 016268–90 (FY 2018); Defs.' Reply, Ex. 2, ECF No. 34-2 (FY 2019). Even with the discretion the agency retains for three years following

---

[11]     No party contends that Plaintiff's separate challenge to the Marine Highway Program is moot. And given MARAD's ongoing grant issuances under the Program, the Court finds Plaintiff's challenge to the Program itself is a live dispute.

submission of the final expenditure report, *see* 2 C.F.R. §§ 200.334, .345, this leaves Plaintiff precious little time to bring challenges to these grant issuances. *See, e.g.*, *Kingdomware Techs., Inc.*, 579 U.S. at 170 (explaining that short-term contracts that can be fully performed within two years "is too short to complete judicial review of the lawfulness of the procurement"); *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1019 (9th Cir. 2010) (finding a three-year contract term to be "too short . . . to give the case full consideration").

Additionally, there is a reasonable expectation that Plaintiff will be subject to the same action again. Grants have been awarded to the James River Project in FY 2010, FY 2016, FY 2017, FY 2018, and FY 2019. MARAD 016812–14. Moreover, since the administrative record was filed, grants were awarded under the James River Project for FY 2021 and FY 2022.[12] It is reasonable to expect that grants will continue.

3.    Notice

In addition to the constitutional inquiries, since Plaintiff is proceeding under the ESA's citizen suit provision it is required to provide pre-suit notice to Defendants. Specifically, the ESA citizen suit provision requires a person bringing a lawsuit to provide "written notice of the violation . . . to the alleged violator" at least sixty days before commencing a lawsuit. 16 U.S.C. § 1540(g)(2)(A)(i). The United States Court of Appeals for the Fourth Circuit has described this provision as a "nonjurisdictional claim-processing rule[]." *Orr v. U.S. EPA*, No. 21-1222, 2022 WL 3334630, at *1 (4th Cir. Aug. 12, 2022) (citing *Sierra Club v. Yeutter*, 926 F.2d 429, 437 (5th Cir. 1991)). The reason for the rule is "to allow the alleged violator to know what it is doing wrong so that it will know what corrective actions will prevent a lawsuit." *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002) (citing *Atl. States Legal Found.*

---

[12]      *See U.S. Marine Highway Program – Grant Awards*, *supra* note 4.

*Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 819 (7th Cir. 1997)). "[T]he notice must be sufficiently adequate so that the recipients can identify the basis for the complaint." *Id.* (citation omitted). However, a plaintiff "is not required to list every specific aspect or detail of every alleged violation" nor are they "required to describe every ramification of a violation." *Pub. Int. Rsch. Grp. of N.J., Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3d Cir. 1995).

Defendants concede that Plaintiff provided adequate notice as to the FY 2018 grant. Defs.' Mem. at 20–21. However, Defendants argue that Plaintiff is barred from challenging any of the other James River Project grants because the FY 2018 grant was the only grant specified in Plaintiff's notice of intent to sue. *Id.* The Court generally rejects Defendants' notice argument; however, it finds Plaintiff's grant-specific challenge is limited to the FY 2018 James River Project grant on the basis of the factual allegations in its Complaint.

Plaintiff's July 27, 2021 letter to MARAD indicated that "several of the specific marine highway projects that have been funded by MARAD grants over the past several years clearly indicate that [the Marine Highway Program] meets the ESA's low 'may affect' threshold for ESA Section 7 consultation." MARAD 016710. Plaintiff then listed six Marine Highway Projects, including the James River Project, and listed one grant for each. MARAD 016710–13. For the James River Project, Plaintiff included the FY 2018 grant. MARAD 016711. Plaintiff also stated that, "[o]n information and belief, MARAD has not initiated ESA Section 7 consultation on any of these or other such projects funded through the Marine Highway Program that affect listed species." MARAD 016715. In its section on "Violations," Plaintiff stated that "the Center is aware of several grants that MARAD has awarded (or is currently considering) for projects that are likely to adversely affect listed species." MARAD 016717.

Plaintiff contends that this is sufficient notice to MARAD that it intended to challenge grants issued under the James River Project in FY 2017, FY 2019, and FY 2021 because Plaintiff

"intended to bring suit against MARAD for its . . . total failure to consult on the issuances of *any* grants under the Program, including for the James River Project." Pl.'s Reply at 10–11 (emphasis in original).

As for the FY 2021 grant, the Court agrees that Plaintiff did not give adequate notice. This is because the FY 2021 grant had not yet been awarded at the time of Plaintiff's notice, and "one cannot give notice of a violation which has not yet happened." *Kern Cnty. Farm Bureau v. Badgley*, No. CV F 02-5376, 2002 WL 34236869, at *13 (E.D. Cal. Oct. 10, 2002); *see also* Defs.' Reply at 14 n.5 ("The Secretary awarded the 2021 grant application in December 2021. Plaintiff's notice of intent to sue was dated July 27, 2021."); *see also Friends of Animals v. Ashe*, 51 F. Supp. 3d 77, 84–85 (D.D.C. 2014) (collecting cases), *aff'd*, 808 F.3d 900 (D.C. Cir. 2015).

As to the FY 2017 and FY 2019 grants, the Court need not decide whether Plaintiff's notice was sufficient because Plaintiff did not allege a failure to consult violation as to these grants in its Complaint. Plaintiff identifies the FY 2018 grant award and adds that "[t]his project has applied to MARAD for additional funding under the latest round of America's Marine Highway Program grants." Compl. ¶ 55. While Plaintiff later references "MARAD's grants," *id.* ¶ 77, these isolated references in the Complaint cannot support a broad challenge to all grants made under the James River Project, as Plaintiff now contends. *See* Pl.'s Reply at 12. Defendants point out that the administrative record contains no evidence related to these grants and that MARAD first became aware Plaintiff was challenging them when Plaintiff filed for summary judgment. Defs.' Reply at 9–10; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (noting that a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests"

(citation omitted)). Given this, the Court finds that Plaintiff's grant-specific challenge[13] is limited to the FY 2018 James River Project grant.

### B. Programmatic Marine Highway Program Consultation

Plaintiff's first argument is that Defendants violated the ESA by failing to conduct a "programmatic consultation" on the Marine Highway Program in its entirety. Compl. ¶¶ 76–82; Pl.'s Mem. at 18–23. As discussed, ESA regulations require an agency to engage in formal consultation with the United States Fish and Wildlife Service or the National Marine Fisheries Service, as appropriate, if it determines any of its actions "may affect listed species or critical habitat" and no exceptions apply. 50 C.F.R. § 402.14(a)–(b). Under the ESA's implementing regulations, an agency "action" is defined broadly to include "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas." 50 C.F.R. § 402.02. Examples include "actions intended to conserve listed species or their habitat," "the promulgation of regulations," "the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid," and "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02. Courts have found that, in order to trigger Section 7 consultation, such actions must be "affirmative." *See Ctr. for Biological Diversity v. EPA*, 847 F.3d 1075, 1090 (9th Cir. 2017) ("[A]n ESA claim accrues only when an agency takes discretionary, affirmative action."); *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012) ("An agency must consult under Section 7 only when it makes an 'affirmative' act or authorization." (citing *Cal. Sportfishing Prot. All. v. FERC*, 472 F.3d 593, 595 (9th Cir. 2006))). Similarly, courts have found that "[t]he retention of discretionary control is

---

[13] The parties do not argue that Plaintiff failed to provide sufficient notice of its programmatic challenge to the Marine Highway Program. The Court finds this is sufficiently alleged in both Plaintiff's intent to sue letter and its Complaint. *See* MARAD 016717; Compl. ¶ 81.

necessary but insufficient to trigger" consultation. *Ctr. for Biological Diversity*, 847 F.3d at 1083

(quoting *Ctr. for Biological Diversity v. EPA*, 65 F. Supp. 3d 742, 758 (N.D. Cal. 2014)).

One type of formal consultation is "programmatic consultation." 50 C.F.R. § 402.02. This

is defined as "a consultation addressing an agency's multiple actions on a program, region, or other

basis." *Id.* The regulations describe this type of consultation as voluntary. *See id.* § 402.14(c)(4)

("Any request for formal consultation *may* encompass, *subject to the approval of the Director*, a

number of similar individual actions within a given geographical area, a programmatic

consultation, or a segment of a comprehensive plan." (emphasis added)).[14]

According to Plaintiff, however, the ESA requires a "two-step process . . . first, an analysis

of the overall program, and second, project-specific evaluations." Pl.'s Mem. at 21. At the first

step, Plaintiff asserts the ESA requires a "systematic determination" of the effects of the Marine

Highway Program on endangered and threatened species and their critical habitats, as this would

allow "the Services to establish standards, guidelines, and criteria to avoid or minimize the effects

of the program by instituting protocols to track and respond to the collective impacts of the

program." Pl.'s Mem. at 2. In support of its position, Plaintiff argues that ESA's implementing

regulations define "action" to include "programs" and there is "no doubt" the Marine Highway

Program, as a whole, may affect listed species. Pl.'s Mem. at 19–20. Plaintiff also cites language

from a 2015 regulation that amended certain requirements in instances where an agency does

request a programmatic consultation, however this regulation did not impose a requirement to

---

[14]     Plaintiff cites to additional language in 50 C.F.R. § 402.14(c)(4) in support of its position
that programmatic consultation is mandatory, specifically, that "[t]he provision in this paragraph
(c)(4) does not relieve the Federal agency of the requirements for considering the effects of the
action or actions as a whole." 50 C.F.R. § 402.14(c)(4). However, this language does not obviate
the need for a discrete, affirmative agency action to trigger consultation in the first place. *See
Karuk Tribe of Cal.*, 681 F.3d at 1021. Nor does it suggest that the kind of multi-action
programmatic review advocated for by Plaintiff is a requirement under the regulations.

conduct such consultations. *See* 80 Fed. Reg. 26832, 26844–45 (May 11, 2015) (codified as amended 50 C.F.R. pt. 402) (clarifying that incidental take statements need not be prepared when consulting on framework programmatic actions); *see also* 84 Fed. Reg. 44976, 44996 (Aug. 27, 2019) (codified as amended 50 C.F.R. pt. 402) ("[M]any types of programmatic consultation would be considered an optional form of section 7 compliance to, for example, address a collection of agency actions that would otherwise be subject to individual consultation.").

Defendants contend that Plaintiff's argument "represents a fundamental misunderstanding of both the [Marine Highway Program] and the ESA." Defs.' Mem at 13. They aver that Section 7 consultation is only triggered by a "discretionary, affirmative action," which Plaintiff's challenge to the Marine Highway Program fails to identify. *Id.* at 14.

Plaintiff's attempt to characterize the Marine Highway Program in its entirety as an "action" is grounded on the inclusion of the word "programs" within the EPA's broad definition of the term "action." 50 C.F.R. § 402.02. However, the Marine Highway Program is not the kind of program that constitutes a discrete agency action triggering consultation. Instead, the Program is a collection of actions—as Plaintiff recognizes—starting with the final rule implementing the Program, and thereafter consisting of "designations, ongoing grants, and other mechanisms." Pl.'s Reply at 3. The core flaw in Plaintiff's argument is that while any of these agency actions *individually* may warrant consultation, this does not mean that *collectively* they warrant *programmatic* consultation.

Plaintiff claims that "[o]ther courts have found that programs that 'may affect' listed species require programmatic consultation." Pl.'s Mem. at 21. However, Plaintiff here is trading on the ambiguity of what constitutes a "program." In each of the cases Plaintiff cites in support of this proposition, consultation was required to consider the impact on specific listed species of discrete agency actions that set guidelines and other thresholds on future activity. *See Lake Cnty.*

21

*Audubon Soc. v. Jamison*, 958 F.2d 290, 293–94 (9th Cir. 1992) (consultation on Bureau of Land Management guidelines for land-use allocation and annual allowable harvest for conservation of Northern Spotted Owl); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1052 (9th Cir. 1994) (consultation on Forest Service Land Resource Management Plans containing "forest-wide and area-specific standards and guidelines" that impacted Snake River chinook salmon); *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1078 (9th Cir. 2015) (consultation on Forest Service management direction that "set specific guidelines and standards for permitting activities" related to the Canada Lynx).[15] While these standard-setting actions may loosely qualify as "programs," the Marine Highway Program clearly does not fit within this paradigm.

Plaintiff also contends that "MARAD's implementation of the [Marine Highway Program] is an agency action" necessitating programmatic consultation. Pl.'s Mem. at 19. Assuming Plaintiff is referring to MARAD's promulgation of the final rule implementing the Program—which is clearly an agency action—this challenge would still be unsuccessful. First, as a threshold matter, consultation as to a single agency action would, by definition, not be "programmatic," and therefore not provide Plaintiff the relief it seeks. 50 C.F.R. § 402.02 (defining "programmatic consultation" as consisting of "multiple actions"). Defendants also point out that Plaintiff's challenge would be beyond the statute of limitations because the implementing regulation was issued in 2010. Defs.' Mem. at 15 n. 5. However, even if the Court were to find no statute of limitation bars the claim because MARAD retained jurisdiction to administer the Program, or because it was an "ongoing" agency action, *see, e.g., Coal. for a Sustainable Delta v. Fed.*

---

[15]     Plaintiff also cites to *Connor v. Burford*, 848 F.2d 1441 (9th Cir. 1988), which did not involve a failure to consult claim. In that case, the United States Forest Service initiated consultation for the sale of oil and gas leases in the Flathead and Gallatin National Forests in Montana. *Id.* at 1443. Similar to Plaintiff's other authority, consultation was taken following a discrete, affirmative agency action.

*Emergency Mgmt. Agency*, 812 F. Supp. 2d 1089, 1106–11 (E.D. Cal. 2011) (collecting authority), a challenge to the regulation underpinning the Marine Highway Program is not ripe for judicial review.

MARAD indicated that it chose not to initiate Section 7 consultation at the time the final rule was originally promulgated because "[w]ithout specific project proposals . . . this action would be premature." 75 Fed. Reg. at 18097. The Court agrees and finds that even if consultation were conducted now, thirteen years into the implementation of the Program, the implementing regulation (and subsequent revisions) remain too disconnected from potential impacts to endangered species. The ripeness doctrine is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967). In determining whether an agency decision is ripe for adjudication, courts consider (1) the "fitness of the issues for judicial decision" and (2) the "hardship to the parties of withholding court consideration." *Id.* at 149.

First, the Court does not find the issues fit for judicial decision. For example, the most recent revisions to the regulation[16] indicate that one of the minimum eligibility requirements for designation of a Marine Highway Route is that it "relieve landside congestion along coastal corridors or . . . promote short sea transportation." 82 Fed. Reg. 56902, 56905 (Dec. 1, 2017) (codified as amended 46 C.F.R. pt. 393). The designation must also "advance" various "objectives," such as providing an "extension[] of the national surface transportation system." *Id.*

---

[16]     These revisions were made in 2017, prior to the statutory changes Congress made to the program through the National Defense Authorization Act for FY 2023. FY 2023 NDAA, *supra* note 3; Defs.' Notice of Suppl. Authority, ECF No. 51.

The eligibility requirements for Marine Highway Projects are similarly broad. According to the regulation, they must "involve the carriage of cargo in Short Sea Transportation," "[i]nvolve new or expand existing services for the carriage of cargo," and be "on a designated Marine Highway Route." *Id.* at 56906.

The consequences to any ESA listed species from these requirements are difficult to discern. The Supreme Court previously considered standards set forth in a United States Forest Service federal land and resource management plan which included "logging goals," "areas of the forest . . . suited to timber production," and "probable methods of timber harvest." *See Ohio Forestry Ass'n, v. Sierra Club*, 523 U.S. 726, 729 (1998). The Supreme Court found a challenge to these far more specific standards to not be ripe for judicial review. *Id.* at 733–37.

The Court also does not believe that failing to engage in this review enacts hardship on the Plaintiff. As with the Forest Service in *Ohio Forestry*, MARAD is required to comply with environmental laws when individual projects are executed. *See id.* at 734. This is the more appropriate time for a challenge because there can be an analysis as to the impact on specific listed species, such as the Atlantic sturgeon. Having found that programmatic consultation is not required, and any challenge to the Program's implementing regulation is not ripe, the Court now turns to Plaintiff's grant-specific challenge.

## C.  FY 2018 James River Project Grant Consultation

Separate from its challenge to the Marine Highway Program as a whole, Plaintiff contends that MARAD violated Section 7 of the ESA by failing to consult with the Services on its issuance of the FY 2018 James River Project grant.[17] Compl. ¶¶ 76–82; Pl.'s Mem. at 23–26.

---

[17]     Defendants concede that the execution of grant agreements is an agency action amenable to suit. Defs.' Mem. at 18. Given that there is no dispute the FY 2018 grant was executed, the Court need not consider whether consultation could have been triggered by an earlier action, such as when the grant was awarded. *See* Defs.' Reply at 14 n.5.

In reviewing an agency action under the Administrative Procedure Act's arbitrary and capricious standard, the Court must consider whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582, 594 (4th Cir. 2018) (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)). This must be "the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983). "[T]he post hoc rationalizations of the agency . . . cannot serve as a sufficient predicate for agency action." *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 539 (1981).

MARAD contends that it was under no duty to consult because it determined that the issuance of the FY 2018 James River Project grant would have "no effect" on listed species. Defs.' Mem. 21–22; *see, e.g.*, *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 475 (D.C. Cir. 2009) (finding that when an agency determines its proposed action will have "no effect" on a listed species or critical habitat, Section 7 consultation is not triggered); *Newton Cnty. Wildlife Ass'n v. Rogers*, 141 F.3d 803, 810 (8th Cir. 1998) (same); *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447–48 (9th Cir. 1996) (same).

This explanation is unpersuasive. There is no evidence contemporaneous with MARAD's decision to issue the FY 2018 James River Project grant of its purported "no effect" finding.[18] Instead, MARAD references its determination that the grant qualified for a categorical exclusion under the National Environmental Policy Act ("NEPA"). MARAD 016626. NEPA, an environmental statute distinct from the ESA, requires federal agencies to prepare, consider, and approve an environmental impact statement for any "major Federal actions significantly affecting

---

[18]     The Court cannot consider Defendants' submission of a memorandum created during the course of this litigation as evidence of their no effect determination. MARAD 016718; *see Am. Textile Mfrs. Inst.*, 452 U.S. at 539.

the quality of the human environment." 42 U.S.C. § 4332(2)(C). Certain actions are categorically excluded from this requirement. A categorical exclusion is defined as "a category of actions that the agency has determined . . . normally do not have a significant effect on the human environment." 40 C.F.R. § 1508.1(d). Thus, pursuant to NEPA, MARAD determined that the FY 2018 James River Project grant had "no significant effect on the human and natural environment." MARAD 016626.

However, MARAD's "no significant effect" finding under NEPA does not mean that MARAD determined the action had "no effect" on endangered species. Defendants attempt to clarify this discrepancy by supplementing the record with excerpts from Maritime Administrative Order (MAO) 600-1. MAO 600-1 includes a sample "Categorical Exclusion Checklist," which, if followed, suggests that MARAD requires a determination that there will be no effect to endangered species in order to meet the agency's criteria for categorical exclusions.[19] However, there is no evidence in the record that this checklist was completed for the FY 2018 James River Project grant.

More importantly, even if MARAD made such a "no effect" determination, it is not supported by the evidence. The threshold to trigger consultation under the ESA is low. Under the ESA, an agency must consult with the Services if it determines that an action "may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). This includes "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character." 51 Fed. Reg. 19926, 19949 (June 3, 1986) (codified as amended 50 C.F.R. pt. 402). As previously discussed, the James River is

---

[19]     The checklist contains a list of statements with corresponding spaces to select "No," "Uncertain," or "Yes." MARAD 016725–26. As the instructions detail, "[i]f all the answers on this list are checked 'No,' then the action(s) meet the criteria for categorical exclusion. If any answer is checked 'Yes' or 'Uncertain,' then an environmental assessment will be prepared unless there is no doubt that an environmental impact statement is required." MARAD 016725. One of the questions is "[t]his action will affect a species listed or proposed to be listed as Endangered or Threatened." MARAD 016726.

designated as critical habitat for Atlantic sturgeon. 82 Fed. Reg. at 39160. In this critical habitat designation, the National Marine Fisheries Service indicated that "vessel strikes" are "threats contributing" to the endangered status of Atlantic sturgeon. 82 Fed. Reg. at 39216. The large size that these fish can reach makes this conclusion unsurprising. *Id.* at 39162 (explaining the fish can weigh up to 800 pounds). A status review conducted by a team of scientists from the National Marine Fisheries Service, United States Fish and Wildlife Service, and United States Geological Survey published a "Status Review of Atlantic Sturgeon" and found with "the increase in boating traffic, the potential for sturgeon to be struck by boats is greater, and this seems to happen commonly." Atlantic Sturgeon Status Review, *supra*, at 91. Moreover, the report indicated that "[l]ocations that support large ports and have relatively narrow waterways," such as the James River, "seem to be more prone to ship strikes." *Id.*; *see also* Balazik, et al., *supra,* at 1062–69. Therefore, the Court finds that the addition of a third barge on the river, one meant explicitly to increase traffic on the James, "may affect" the sturgeon living there.

As such, to the extent MARAD concluded the FY 2018 James River Project grant would have "no effect" on Atlantic sturgeon, this "runs counter to the evidence before the agency." *Sierra Club*, 897 F.3d at 590 (citations omitted). The Court therefore finds the agency's decision not to conduct an ESA consultation on the issuance of this grant to be arbitrary and capricious. 5 U.S.C. § 706(2)(A).

## IV.   CONCLUSION

Both Plaintiff and Defendants' summary judgment motions will be granted in part and denied in part. The Court finds MARAD in violation of the ESA for failure to conduct a Section 7 consultation on its issuance of the FY 2018 James River Project grant. The Court will order MARAD to engage in Section 7 consultation on the FY 2018 grant to determine whether it is "likely to jeopardize the continued existence" of Atlantic sturgeon populations in the James River.

16 U.S.C. § 1536(a)(2). The parties will be directed to meet and confer and submit to the Court a proposed schedule for consultation by April 14, 2023. Upon receipt of the proposed schedule, the Court will issue a Final Order containing the schedule and the declaratory and injunctive relief described above.

/s/

Elizabeth W. Hanes
United States District Judge

Date: March 31, 2023
Newport News, Virginia