IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br><br>　　　　Plaintiff,<br><br>　　　v.<br><br>U.S. MARITIME ADMINISTRATION,<br>PETE BUTTIGIEG, in his official capacity,<br>and LUCINDA LESSLEY, in her official<br>capacity,<br><br>　　　　Defendants. | Civil Action No. 4:21-cv-132 (EWH/LRL) |

**PLAINTIFF'S RESPONSE MEMORANDUM REGARDING REMEDY**

　　　Pursuant to the Court's May 2, 2023, Minute Order, Plaintiff provides the following memorandum regarding the appropriate remedy in this matter. As set forth below, Plaintiff believes that given the Court's decision and the facts at hand, the Maritime Administration ("MARAD") cannot make a valid "not likely to adversely affect" determination for the issuance of the 2018 James River grant and should therefore initiate and complete formal Endangered Species Act ("ESA") consultation to fully analyze the impacts of the agency action on the endangered Atlantic sturgeon. However, should the Court permit MARAD to first make an initial determination, Plaintiff requests that the Court require MARAD to complete a biological assessment to support its determination and retain jurisdiction to ensure MARAD complies with its ESA Section 7 duties.

## I.  INTRODUCTION

On March 31, 2023, the Court ruled in favor of Plaintiff on its claim that MARAD violated the ESA when it failed to consult with the National Marine Fisheries Service ("NMFS") over the issuance of a 2018 grant intended to increase vessel traffic on the James River, finding that it met the ESA's low "may effect" threshold due to impacts to endangered Atlantic sturgeon. Memorandum Opinion on Motions for Summary Judgment, ECF 52 ("Opinion"). Accordingly, the Court directed the parties to provide the Court with a proposed schedule to complete Section 7 consultation. *Id*. at 28.

The parties submitted a proposed schedule with an agreed-upon timeline for MARAD to reach a decision on its proposed approach to engaging in Section 7 consultation. ECF 54. However, that the parties were able to agree to a timeline does not mean that there was not considerable disagreement over *how* MARAD was intending to engage in consultation.[1] In particular, Plaintiff expressed concern that the agency appeared to have already determined—prior to undertaking any analysis—that it would make a "not likely to adversely affect" determination, and made clear that it believed that the record and the Court's Opinion show that formal consultation is required to comply with the ESA. Since Defendants would not agree to undertake formal consultation at the outset, Plaintiff proposed that the agency complete a biological assessment and then either seek concurrence or initiate formal consultation based on the results of that assessment, which is the normal course of action for "informal" Section 7

---

[1] Contrary to the Defendants' alleged grievances with Plaintiff's position, *see* MARAD at 2, n.1, the parties' disagreement with regards to these matters is readily apparent in the scheduling notice filed with the Court. *See* ECF 54 (noting that it was only Defendants' position that the agency could comply with the ESA through informal consultation and that the parties were merely agreeing to a timeline). Defendants' argument that Plaintiff should have filed its own schedule if it did not agree is therefore misplaced.

consultation, as discussed below. MARAD, however, rejected that approach and was adamant that it would seek a concurrence without conducting a biological assessment, as set forth in the scheduling notice. Balancing the timeline for MARAD's proposed actions against Plaintiff's interest in not burdening the Court with this conflict, the parties agreed to a timeline and submitted it to the Court.

At the subsequent status conference on May 2, 2023, the Court requested feedback on the parties' position regarding MARAD's consultation obligations and whether the Court should retain jurisdiction over this matter. As Plaintiff explained, because it appeared that MARAD had unlawfully pre-determined the outcome of the Section 7 consultation and the facts could not support a "not likely to adversely affect" determination, the Court should maintain jurisdiction to ensure MARAD fulfills its obligations under the Court's order. The Court thus requested further briefing on remedy.

Because the Court has already determined that MARAD violated the ESA and must engage in Section 7 consultation, the only remaining question is what form that consultation should take. In making that decision, the Court should take into consideration that this is not the usual ESA Section 7 case for several reasons. First, in contrast to a significant portion of ESA cases where the court is asked to review the adequacy of an agency's analysis under the ESA to determine whether it is sufficient, here MARAD failed entirely to engage in *any* consultation, and the record shows it made no effort to consider the impacts to highly imperiled Atlantic sturgeon when it took action that this Court found "may affect" the species. Yet now, MARAD is proceeding as if this were nothing more than a minor oversight that it can resolve through an informal letter to NMFS seeking concurrence in a "not likely to adversely affect" determination, which the agency appears to have pre-determined, thereby avoiding its analytic obligations.

3

Second, this a rare instance in which we have very specific language from the expert wildlife agency indicating that the agency action (i.e., increasing vessel traffic on the James River) poses a particularly significant threat to Atlantic sturgeon. Thus, it is clear from the unique circumstances here that MARAD cannot make a valid "not likely to adversely affect" determination, and formal consultation is required.

Plaintiff, therefore, believes that given the specific facts surrounding this matter, it would be proper for the Court to order MARAD to proceed with completing formal consultation. If, however, the Court is not inclined to specifically require formal consultation, then Plaintiff requests that the Court require MARAD to complete a biological assessment to support its determination and retain jurisdiction to ensure that MARAD does not continue to evade its Section 7 duties.

## II. ARGUMENT

### A. MARAD Cannot Justify a "Not Likely to Adversely Affect" Determination

As this Court noted in its Opinion, the threshold for triggering the consultation requirement under the ESA is low. *See* Opinion at 17 (citing 50 C.F.R. § 402.14(a); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011)). Courts have made clear that this low bar, when exceeded, generally requires *formal* Section 7 consultation. *See W. Watersheds Project*, 632 F.3d at 495 (the ESA "requires a federal agency to complete *formal* consultation with FWS if the agency determines that any action on its part 'may affect' any listed species or critical habitat") (citations omitted) (emphasis added); *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 178 (D.C. Cir. 2017) (if an action agency "determines that an action 'may affect' an endangered species, formal consultation is usually required"); *see also* 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) ("Any possible effect, whether beneficial, benign, adverse, or of

4

an undetermined character, triggers the *formal* consultation requirement.") (emphasis added); 50 C.F.R. § 402.14(a) ("Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, *formal consultation is required* . . . .") (emphasis added).

It is only when the action agency can make a valid "not likely to adversely affect" determination, and it receives a concurrence from the relevant expert wildlife agency—here, NMFS—on that determination, that formal consultation is not required. 50 C.F.R. § 402.14(b). The Services' Section 7 Consultation Handbook[2] describes precisely how the "likely to adversely affect" trigger for formal consultation works. It explains that an "is likely to adversely affect" determination is the appropriate finding "if *any adverse effect* to listed species may occur as a direct or indirect result of the proposed action or its interrelated or interdependent actions, and the effect is not: discountable [or] insignificant . . . ." Handbook at xv, 3-13 (emphasis added). The Consultation Handbook further make clear that "[i]nsignificant effects relate to the size of the impact and should never reach the scale where take occurs," while "[d]iscountable effects are those extremely unlikely to occur." *Id.* Accordingly, "[b]ased on best judgment, a person would not: (1) be able to meaningfully measure, detect, or evaluate insignificant effects; or (2) expect discountable effects to occur." *Id.* at xvi.

It is clear based on available facts that MARAD cannot possibly make a valid "not likely to adversely affect" determination here. As the Court has already determined, when designating the James River as critical habitat for the Atlantic sturgeon, NMFS stated that vessel strikes are

---

[2] Available at https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf. Courts often look to the Services Section 7 Consultation Handbook to "flesh out" the definitions of the ESA. *Appalachian Voices v. United States DOI*, 25 F.4th 259, 270 (4th Cir. 2022); *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 634 (9th Cir. 2014) (relying on the Consultation Handbook).

not only threats contributing to the endangered status of the species, but that this conclusion is "unsurprising" given the significant size of the fish. Opinion at 27. The Court noted that NMFS found in its Status Review for Atlantic Sturgeon that with "the increase in boating traffic, the potential for sturgeon to be struck by boats is greater, and this seems to happen *commonly*." *Id.* (emphasis added). The Court further noted that "the report also indicated that '[l]ocations that support large ports and have relatively narrow waterways,' such as the James River, 'seem to be more prone to ship strikes.'" *Id.* The Court therefore found that "the addition of a third barge on the river, one meant explicitly to increase traffic on the James, 'may affect' the sturgeon living there." Opinion at 27.

Instructively, when analyzing other projects where an agency action increased vessel traffic in habitat for listed sturgeon, NMFS has made clear that vessel traffic in the James River poses a particularly significant risk for Atlantic sturgeon. For example, when reviewing the Tappan Zee Bridge Replacement Project,[3] NMFS stated in its biological opinion that vessel strikes have "been identified as a *significant concern* in the Delaware and James rivers" due to unique geographic features in these areas (e.g., narrow migration corridors combined with shallow/narrow river channels), which "increase the risk of interactions between vessels and Atlantic sturgeon," and that this "*significant threat*" in the James River is due to "several vessel struck individuals [] each year." *See* Tappan Zee Bridge Replacement Project Biological Opinion at 97 (emphasis added).[4]

---

[3] Importantly, the Tappan Zee Project only required 6 vessel trips per day over 90 days of dredging, while the barge purchased with the MARAD grant is intended to support 27% annual growth of vessel traffic on the James River and will increase such vessel traffic indefinitely by allowing hundreds if not thousands of vessel trips over an unlimited timeframe.

[4] Available at https://www.newnybridge.com/documents/environment/2013-nmfs-bio-opinion.pdf. Consideration of this biological opinion is warranted because "[f]or purposes of the remedy phase, a court is not limited to the administrative record." *NRDC v. United States*

6

This leaves no doubt that the impacts of MARAD's actions cannot possibly be deemed discountable or insignificant. To put it simply: given that vessel strikes are "unsurprising" and "common" on the James River, the impacts of MARAD's actions (i.e., issuing a grant that adds hundreds of vessel trips annually in sturgeon critical habitat) cannot be considered discountable. And because NMFS has found that take through such vessel strikes is a "significant threat" contributing to the endangered status of the species, MARAD's actions are certainly not insignificant. Therefore, given the Court's own findings[5] and statements made by NMFS itself, any attempt by MARAD to claim that the agency's actions are nonetheless "not likely to adversely affect" Atlantic sturgeon would be arbitrary and capricious.

Furthermore, as the Services explain in the Consultation Handbook at 3-13, whether the agency action is likely to adversely affect listed species must be considered in the context of interrelated and interdependent actions. Here, the Court noted that the grant at issue was not an isolated action, but rather was "intended to 'accommodate an estimated 27% annual growth' on the route and estimated to 'increas[e] the number of weekly trips to seven days'. . . . " Opinion at

---

*Army Corps of Eng'rs*, 457 F. Supp. 2d 198, 206 (S.D.N.Y. 2006). The Court may also take judicial notice pursuant to Fed. R. Evid. 201(c), since it is a government document produced by an expert agency, the accuracy of which cannot be reasonably questioned, and the facts therein are not subject to reasonable dispute by Defendants. *See United States v. Chester*, 628 F.3d 673, 692 (4th Cir. 2010) (taking judicial notice of government reports); *Funderburk v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 714 (D.S.C., 2019) ("Generally, a federal district court may take judicial notice of '[p]ublic records and government documents [that] are generally considered 'not to be subject to reasonable dispute.'") (citations omitted).

[5] Defendants' assertion that the Court's determination was "based on evidence not contained in the administrative record," MARAD at 5, is off base. Since the agency ignored the impacts to sturgeon and unlawfully failed to consult on the issuance of the grant, the administrative record contained no information on the species and the potential harm from vessel strikes. As a result, the Court *had* to look to sources outside the record to show that the agency failed to consider an important aspect of the problem. *See Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. at 43; *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1037 (9th Cir. 2001).

12. Since MARAD's goal of increasing ship traffic by 27% annually is interrelated with the grant, the determination as to whether its actions are likely to adversely affect imperiled sturgeon must take into account not only the increased risk of vessel strikes from hundreds of additional vessel trips annually due to the purchased barge, but also the increase in vessel traffic from the intended 27% annual growth in ship traffic that MARAD's grant was intended to support. This drastically increases the likelihood of collisions, further "contributing to the endangered status of the species," as NMFS found. Opinion at 12-13. Given that context, there is simply no way that MARAD (or NMFS) could justify a "not likely to adversely affect" determination.

      The facts here therefore show that formal Section 7 consultation is required. Contrary to the Defendants' argument (at 6-7) that the Court is unable to require MARAD to engage in formal consultation, district courts have "broad latitude in fashioning equitable relief when necessary to remedy an established wrong." *Pac. Coast Fed'n of Fishermen's Ass'ns v. United States Bureau of Reclamation*, 226 Fed. Appx. 715, 718 (9th Cir. 2007) (quoting *Alaska Ctr. for the Env't v. Browner,* 20 F.3d 981, 986 (9th Cir. 1994)). Here, the Court certainly has equitable discretion pursuant to the Administrative Procedure Act—which allows the Court to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1)—and the ESA citizen suit provision, 16 U.S.C. § 1540(g)(1)—providing that "district courts shall have jurisdiction. . . to enforce any such provision or regulation," which includes enforcing compliance with the formal Section 7 consultation obligation set forth in 50 C.F.R. § 402.14. Indeed, district courts often issue orders requiring formal consultation where the facts show that the agency action is likely to adversely affect listed species. *See, e.g., Idaho Conservation League v. United States Forest Serv.*, 2019 U.S. Dist. LEXIS 102675, *12 (D. Ariz. 2019) (ordering an agency that failed to consult to engage in formal consultation); *Preserve Our Island v. United States Army Corps of Eng'rs*, 2009

8

U.S. Dist. LEXIS 71198, *59 (D. Wash. 2009) (issuing an order for the agency to initiate and complete formal ESA consultation); *Forest Serv. Emples. for Envtl. Ethics v. United States Forest Serv.*, 397 F. Supp. 2d 1241, 1257 (D. Mont. 2005) ("The remedy here is an order to the USFS to engage in formal consultation . . . .").

Meanwhile, the cases Defendants rely on are inapposite, since a determination that formal consultation is required would not entail the Court becoming "excessively entangled" by dictating the specific outcome of the consultation process. *See* MARAD at 6-7. Indeed, the cases Defendants rely on are not even ESA cases—indicating how far Defendants had to reach for supporting caselaw—and the general propositions cited therein were not made within the context of determining whether formal or informal consultation is required, an inquiry that does not raise the same concerns over judicial overreach as the completely unrelated evidentiary concern at issue in *Fed. Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326 (1976),[6] or the jurisdictional timing issue in *Hyatt v. U.S. Patent and Trademark Off.*, 110 F. Supp. 3d 644 (E.D. Va. 2015). *See* MARAD at 7. Regardless, the court in *Hyatt* noted that "even where the *manner* of an agency's action is left to that agency's discretion, courts may compel the agency to take discrete and legally required agency action without dictating the content of that action." *Id.* at 652 (citations omitted) (emphasis in original). Thus, even under the disparate case law Defendants rely on, it would be consistent for the Court to compel the agency to undertake the legally required formal consultation, since that does not dictate the content or outcome of the consultation process.

---

[6] *Fed. Power Comm'n* was not even an APA case much less an ESA case, and the Court's decision was premised on the "mode of review that is contemplated by the statute providing for judicial review of Commission decisions, § 19(b) of the Act, 15 U.S.C. § 717r(b)." *Id.* at 332. It is therefore entirely unrelated to the environmental administrative law context of this case.

9

And again, this is not the normal ESA case because the Court here is not reviewing the adequacy of the agency's analysis, but rather enforcing the ESA in light of MARAD's significant failure to *ever* consider the impacts of its actions on federal-protected species under the ESA. *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 173 (1978) ("One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7."). And while in "failure to consult" cases there are circumstances where the court has ordered the agency to comply with the Section 7 requirements but not specified the form the consultation must take, that is often because there has been such a failure to consult but the record does not contain the requisite information to make a finding as to whether the action triggers the formal consultation requirement. However, that is not the case here since NMFS has already made clear that vessel traffic poses a particularly significant threat to Atlantic sturgeon in the James River, thereby showing that MARAD's actions to increase such vessel traffic meet the low threshold for formal Section 7 consultation.[7] Thus, while the ESA contemplates that the action agency can generally make the initial determination as to whether the action is, or is not, likely to adversely affect listed species, MARAD not only failed to do so at the appropriate time here, but this is also a somewhat rare case in which the Court *does* have the fact-specific information necessary to support a determination that formal consultation is required.

---

[7] Defendants argue that the Court cannot determine that formal consultation is required because that would require making "many fact-specific determinations," including looking at "all consequences to listed species or critical habitat caused by the proposed action," as well as the timing and specific components of the action. MARAD at 6, n.5. Defendants, however, cite to the regulation at 50 C.F.R. § 402.14(c)—providing the information an agency must submit to initiate formal consultation—which does not establish the parameters for making a "not likely to adversely affect" determination. Here, the evidence before the Court is sufficient to show that the agency action *is* likely to adversely affect endangered sturgeon, and Plaintiff disagrees that the Court is not in a position to make that determination. Regardless, if the Court allows MARAD to make that "fact-specific" determination, it must do so in a biological assessment to ensure that analysis actually takes place and MARAD does not continue to side-step its Section 7 duties.

### B. MARAD Cannot Proceed Under the Version of Informal Consultation it Proposes

The version of "informal consultation" that MARAD proposes to follow (i.e., an informal letter seeking a concurrence pursuant to 50 C.F.R. § 402.13 without conducting a biological assessment) is simply inappropriate. That preliminary, optional process—wherein the agency is meant to discuss the proposed action with NMFS and consider modifications as the action is developed in order to avoid adverse impacts to listed species or critical habitat and thereby determine whether the agency may eschew formal consultation—would not ensure that MARAD provides the necessary analysis to ensure that endangered sturgeon *are* protected under the facts here.

There are two obvious problems with MARAD following its proposed course: First, it is readily apparent that the impacts are not discountable or insignificant, as discussed above, and thus a "not likely to adversely affect" determination is unwarranted. MARAD's plan to seek a concurrence through an informal letter pursuant to 50 C.F.R. § 402.13 is yet another attempt by the agency to side-step its obligations under the ESA and avoid considering and addressing threats to protected wildlife, which is inconsistent with the Court's Opinion. There is simply no good reason at this point to allow MARAD to waste time engaging in that informal process.

Second, even if that were not the case, MARAD did not undertake any discussions with NMFS *before* it issued the grant, as 50 C.F.R. § 402.13 contemplates, and thus there was no opportunity to work with NMFS to determine what modifications should be made to protect Atlantic sturgeon at the "earliest possible time," as the ESA requires. 50 C.F.R. § 402.14(a); *see also NRDC v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) (Section 7 requires that the agency consult with the Services *before* engaging in the action). Having failed to comply with the law when it issued the grant, MARAD should not now be allowed to pursue an informal

11

process intended only for a preliminary review (and which is inconsistent with the plain language of the ESA, as discussed below), particularly where it is evident that formal consultation is required.

In sum, the Court should not condone yet another attempt by MARAD to avoid the full analysis that Section 7 requires in order to afford listed species the "highest of priorities." *See Tennessee Valley Authority*, 437 U.S. at 194 ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'"); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1055-57 (9th Cir. 1994) (discussing the importance of the consultation requirement to effectuate the ESA's "institutionalized caution" mandate) (citation omitted).

### C.  MARAD Must Complete a Biological Assessment

Should the Court allow MARAD the opportunity to make an initial effects determination, Plaintiff requests that the agency not be allowed to seek a concurrence pursuant to the informal consultation process under 50 C.F.R. § 402.13 without first undertaking a biological assessment, as required by the plain language of the ESA.

Biological assessments are integral to the consultation process, including informal consultation. In fact, most informal consultations (i.e., requests for concurrence pursuant to 50 C.F.R. § 402.13) are based on a biological assessment. As the Ninth Circuit has explained, "[i]nformal consultation occurs when the action-proposing agency determines in a biological assessment that the action 'is not likely to adversely affect listed species or critical habitat,' and the wildlife agency concurs in writing, thereby terminating the consultation process." *All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1030 (9th Cir. 2018) (citing 50 C.F.R. § 402.13(a)); *see*

*also Ctr. For Biological Diversity v. EPA*, 56 F.4th 55, 62 (D.D.C. 2022) ("First, before taking any covered action . . . the action agency, with assistance from the Wildlife Services, must conduct a threshold biological assessment. That assessment yields an effects determination identifying the species, habitats, and geographic areas that may be present, and setting forth an empirically based judgment whether the proposed action may affect a listed species or critical habitat.").

This is supported by the plain language of the ESA, which requires a biological assessment "[t]o facilitate compliance with the requirements of subsection (a)(2)." 16 U.S.C. § 1536(c)(1); *WildEarth Guardians v. United States Fish & Wildlife Serv.*, 416 F. Supp. 3d 909, 919 (D. Ariz. 2019) (the plain language of the ESA requires that "[i]f a listed species may be present in an action area, the action agency must create a Biological Assessment") (citing 16 U.S.C. § 1536(c)(1)); *Friends of the Clearwater v. Petrick*, 588 F. Supp. 3d 1071, 1085-1086 (D. Idaho 2022) (pursuant to the plain language of the ESA, if listed species "may be present, [the action] agency shall conduct a biological assessment") (citing 16 U.S.C. § 1536(c)(1)). "[T]he language of the ESA suggests that Congress designed section 7(c)(1) as a precursor to assist in the final determination that an agency action may affect a listed species." *Id.*

MARAD must therefore "adhere to the requirements of § 1536(c)(1)" by "preparing a [biological assessment] for species that may be present—as part of the process of determining whether the action may affect a listed species." *Id.; see also Native Ecosystems Council v. Marten*, 612 F. Supp. 3d 1146, 1158 (D. Mont. 2020) (explaining that "the statute governing the preparation of a [biological assessment] is straightforward and clear," and "the [biological assessment] is the mechanism by which an agency concludes that its proposed action will have

13

"no effect," "may affect," or "is likely to adversely affect" a listed or proposed species) (citing 16 U.S.C. § 1536(c)(1)).

Requiring MARAD to complete a biological assessment would not be onerous,[8] and is particularly important here because the agency has made clear that it is pre-determining the outcome of the consultation process by proclaiming, before it has done any analysis, that it intends to make a "not likely to adversely affect" determination. *See* ECF 54. As explained, the biological assessment is specifically intended to support a determination as to whether formal consultation is required, and the Services have crafted regulations intended to ensure the agency provides sufficient information upon which to base its determination. *See* 50 C.F.R. § 402.12. And while the informal letter that accompanies a request for concurrence pursuant to 50 C.F.R. § 402.13(c)(1) must contain information "similar" to what is required for the initiation of formal consultation under 50 C.F.R. § 402.14(c)(1), that is only basic background information about the purpose of the action, the timing, the location, and its nature and scope. In contrast, a biological assessment is intended to also include specific information on impacts to listed species, such as the views of experts and a review of the scientific literature, as well as an analysis of the effects of the action and cumulative effects. *See* 50 C.F.R. § 402.12(f).

Given the foregoing, the Court should ensure that the agency does not continue to avoid its ESA duties by requiring a full analysis through a biological assessment—even if it does not outright require formal consultation from the outset. Indeed, that is essential here because

---

[8] As the Court explained in *Native Ecosystems Council v. Marten*, 612 F. Supp. 3d 1146 (D. Mont. 2020), "[t]he [biological assessment] process itself does not place an onerous burden on the action agency. It places an appropriate burden of analysis and communication. Where listed or proposed species 'may be present,' agencies must assess the risk of their action to those species and receive expert feedback. If the risk to species is deemed minimal, then the consultation obligations are discharged once the fish and wildlife agency informally concurs." *Id*. at 1158-1159 (citing *Pac. Rivers Council v. Thomas*, 30 F.3d at 1054 n.8) (citations omitted).

otherwise it appears MARAD's review would be a "barren exercise of supplying reason to support a pre-ordained result," *Food Marketing Institute v. Interstate Commerce Com.*, 587 F.2d 1285, 1290 (9th Cir. 1978), which is anathema to the ESA's clear duty to give the benefit of the doubt to listed species. *See NRDC v. Kempthorne*, 506 F. Supp. 2d 322, 361-2 (E.D. Cal. 2007) ("the agency must carefully examine the available scientific data" in order to "give the 'benefit of the doubt' to the species," as the ESA requires).

For the same reasons, Plaintiff requests that the Court retain jurisdiction over this matter to ensure that MARAD complies with its ESA Section 7 obligations.

## III.   CONCLUSION

For the foregoing reasons, MARAD should initiate and complete formal ESA Section 7 consultation on the issuance of the 2018 grant. If the Court decides not to order formal consultation, Plaintiff requests that it require the agency to conduct a full biological assessment to support its determination and retain jurisdiction to ensure that MARAD complies with the ESA.

Dated: May 30, 2023.                                    Respectfully submitted,

/s/ Hannah Connor
Hannah Connor (VSB # 74785)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Tel: (202) 681-1676
Email: hconnor@biologicaldiversity.org

Jared Margolis (*pro hac vice*)
Center for Biological Diversity
2852 Willamette St. # 171
Eugene, OR 97405
Tel: (802) 310-4054
Email: jmargolis@biologicaldiversity.org

*Attorneys for Center for Biological Diversity*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on May 30, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the service was perfected on all counsel of record and interested parties through this system, which will deliver a true and correct copy of the foregoing document via CM/ECF.

Date: May 30, 2023                                                By: *s/ Hannah Connor*
                                                                                 Hannah Connor